DOUGLAS BARTLEY McGILTON *v.* STATE
OF MARYLAND

[No. 541, September Term, 1970.]

*Decided June 4, 1971.*

The cause was argued before ORTH, MOYLAN and POW-
ERS, JJ.

*Thomas V. Miller, Jr.,* for appellant.

*John P. Stafford, Jr., Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Arthur
A. Marshall, Jr., State's Attorney for Prince George's
County,* and *E. Allen Shepherd, Jr., Assistant State's
Attorney for Prince George's County,* on the brief, for ap-
pellee.

ORTH, J., delivered the opinion of the Court.

Douglas Bartley McGilton was convicted by a jury in
the Circuit Court for Prince George's County of five
crimes arising from the breaking of an apartment on 17
August 1969: (1) the burglary of the dwelling of Flor-
ence S. Hoffheimer; (2) carrying a deadly weapon con-
cealed upon his person; (3) carrying a deadly weapon
openly with intent to injure; (4) assaulting Eugene Bro-
cious; and (5) assaulting Leroy F. Knowles. He was sen-
tenced to 15 years on the burglary conviction and sen-
tences were imposed on the other convictions to run con-
currently.

We discussed the admissibility of identification evi-
dence and the procedure to be followed when it is chal-
lenged in *Smith and Samuels v. State,* 6 Md. App. 59,
cert. denied, Court of Appeals of Maryland, 24 June
1969. We summarized the rules in *Miller v. State,* 7 Md.
App. 344 and again in *Jones v. State,* 10 Md. App. 420.
We have applied them in many cases reviewed by us. It

seems that the lower court here did not fully appreciate the proper application of the principles enunciated with regard to the admissibility of evidence of identification and it is certain that it did not follow the procedure set out.

Mrs. Florence S. Hoffheimer testified that her ground floor apartment in the Penn-Brooke Terrace complex had been broken—a bedroom window screen was removed and the window and lock were broken—on 17 August 1969 between approximately 6:00 and 9:30 P.M. Robert Eugene Brocious, who lived in the apartment directly above her, while walking his dog about 9:10 P.M. near the premises, saw a blond haired man dressed in a yellow shirt and white sneakers walk by. He was asked if he saw that man in court. Appellant objected, the objection was summarily overruled and defense counsel requested a bench conference. At the bench defense counsel said that an in-court identification of appellant would be tainted because of an illegal extrajudicial photographic viewing procedure. The court said: "He [the Assistant State's Attorney] didn't ask him that. He asked him whether he could identify that person wearing a yellow shirt, white sneakers, with blond hair." The State did not think the witness had been shown photographs; defense counsel thought he had been shown a photograph. With that question then unresolved, the court said: "We feel the question as propounded is a fair one and we await anxiously the answer of the witness. Your motion or your objection will be overruled." Before the jury, over further objection, the witness made a positive in-court identification of appellant as the person he had seen. Brocious took his dog back to his apartment and looking over his balcony saw a screen from the Hoffheimer apartment lying on the ground. He went to a neighbor's apartment and told him to go to the front door of the Hoffheimer apartment. "* * * I'll go around and try to chase him out or get him out." He went to the broken window, saw "shadows moving" inside and hollered, "Come on out." The person inside turned toward the win-

dow and Brocious saw his face plainly. The man then ran out the front door. He was asked if he saw the person in court. Defense counsel objected, the objection was summarily overruled and the State asked to approach the bench. The transcript reads:

> "THE COURT: Mr. Shepherd, it seems to me that the very simple question you might ask this witness is whether or not he identified this defendant as the man he saw.
> MR. SHEPHERD (Assistant State's Attorney) : I realize that. It is just that I am trying to protect the record, and I think that we have reached that point that Mr. Miller alluded to here. I think he is entitled to at least this one witness out of the hearing of the jury. Now, he made the objection and he's building the record.
> THE COURT: I am not concerned about building the record. If this man can clearly identify —this is not an in-court identification nor is it a police station identification. This is an actual identification; is it not?
> MR. SHEPHERD: Yes, sir.
> THE COURT: And if this witness can testify —we haven't had his answer yet — if he can testify that he clearly identified this man, I think he has a right to do so."

Before the jury, over further express objection summarily overruled, the witness made a positive in-court identification of appellant as the person he saw in the apartment. When the person fled the apartment, Brocious ran to the front of the building. "I just about cut him off outside." Asked who he had just about cut off, he said, over objection which was overruled, "Mr. McGilton," but then he qualified that identification: "I saw Mr. McGilton, but not to recognize looks but by clothes as the man ran. * * * He had a yellow shirt, white sneakers and blond hair. I can't recall the pants now." The fleeing man "like to run over Mr. Knowles because Mr. Knowles

was coming in from walking his dog and he just missed Mr. Knowles when he run by him." Brocious went to his apartment accompanied by Knowles. They looked over the balcony. Brocious said: "He's down there again because I can see his tennis shoes, his white feet." Appellant "* * * come out from under the balcony and stuck his gun up around and pointed the gun * * * right directly at me." Appellant told Brocious that he was a security guard at the development, but Brocious knew this "was a lie because we don't have no security guards." Soon after the police arrived. On cross-examination the witness said he had seen appellant about half a dozen times. He had never seen him before 17 August but he saw him after that night at the police station and at a preliminary hearing. When he saw him in the apartment the lighting conditions "was very good. He was standing in a lit hallway." His wife had seen appellant entering the Hoffheimer apartment through the bedroom window.[1] "That is how I knew he was in there." At the police station he was shown one photograph of appellant by police. On redirect examination Brocious said he was present when appellant was captured by the police. He was asked: "Are you basing your identification here today on the photograph that you saw or the six or approximately six times you saw the defendant on the 17th of August?" He replied: "I am judging on the six times I saw him in August when I chased him." The court pressed the point, asking: "The identification here, Mr. Brocious, today is based upon your identification of the defendant at the time he was in the apartment owned by Mrs. Hoffheimer; is that correct?" The witness said it was. The court continued: "And you didn't need the picture to help or the photograph to help you identify him?" The witness answered: "No."

Allen Reed substantiated Brocious' testimony in substance. He saw a man leave Hoffheimer's apartment with a pistol in hand. Reed went back to his apartment and

---

1. Mrs. Brocious did not testify at the trial, nor did she talk to the police. Mr. Brocious said: "She didn't want to get involved."

called the police. Over objection summarily overruled he made a positive in-court identification of appellant as the man he saw. He asserted on cross-examination that he was not shown photographs by the police.

Leroy Knowles testified that he was walking his dog about 9:00 P.M. on 17 August when a man "come busting out" of the Hoffheimer apartment and passed by him. He got a good look at the man. Over objection made and summarily overruled he made a positive in-court identification of appellant as the man. He went to Brocious' apartment. "* * * [W]e were out on the balcony and I was looking down to see where he had got into this apartment, and at that time when we looked over, something in the shape of a weapon, a pistol, was pointing up. So we moved back." He saw "a portion of [defendant's] head and his hand." On cross-examination he could not remember whether the police showed him a photograph of appellant.

Private Harold W. Ruslander of the Prince George's County police responded to a call to go to the apartment about 9:25 P.M. on 17 August. He was met by Knowles, Brocious and Reed and conversed with them. "As a result of the conversation I broadcast a lookout for a suspect that had broken into an apartment in that building." Shortly after he received a call that a man answering the description given "was seen running from the direction of the apartment towards Pennsylvania Avenue." He went toward Pennsylvania Avenue. "In the distance I saw a white male with blond hair at that time wearing a T-shirt, black trousers, and you could see a yellow shirt dangling from the back of his trousers. And I was approximately 75 yards away and another cruiser * * * also arrived on the scene. At that time we stopped the suspect that we had. It was appellant. He was apprehended about 200 yards from the apartment. On cross-examination Ruslander said that a Detective Vitek later showed a photograph of appellant to Brocious, Knowles and Reed.

Officer M. Magone of the Prince George's County po-

lice received a lookout for "a white male wearing dark trousers, a gold or yellow type banlon shirt, and possibly armed." He spotted appellant walking eastbound on Pennsylvania Avenue and arrested him. A Uniwork Model 22, Type G, tear gas pistol was found in his right rear pocket.

In presenting his case, appellant recalled Ruslander to the stand to testify on his behalf. The transcript reads:

"By Mr. Miller (defense counsel) :

Q. Private Ruslander, Officer Magone testified that you were the officer in charge of this case. Would you please advise the Court as to what methods of identification were used at the Seat Pleasant Police Station on the night of August 17, 1969?

MR. SHEPHERD (Assistant State's Attorney) : Objection. It has already been covered.

THE COURT: Objection sustained. He has already testified that they called the fingerprint man and they didn't use that. They didn't photograph the defendant to his knowledge.

MR. MILLER: But —

THE COURT: He was asked whether or not there was a line-up and he hadn't any knowledge of a line-up. You haven't covered that but you have covered the rest of it.

By Mr. Miller:

Q. Was there a line-up conducted on the night of the 17th of the defendant?

A. No, sir.

Q. Was more than one picture shown to the three witnesses, Knowles —

MR. SHEPHERD: Objection.

THE COURT: The objection will be sustained. He already answered he didn't know anything about any photos.

MR. MILLER: He testified that he was pres-
ent when photos were shown. This is Pri-
vate Ruslander.

MR. SHEPHERD: He has already testified to
it. That's the important part.

MR. MILLER: This is the defendant's part.

THE COURT: We recall his testimony that he
doesn't recall any photographs being taken
or shown. Now you may ask him once again
and we will get done with it.

By Mr. Miller:

Q. Do you recall any photographs being shown?

A. Yes, sir, photographs were shown.

Q. And who showed them — who was it that
was shown the photos?

A. They were shown to the three witnesses,
Mr. Brocious, Mr. Knowles and Mr. Reed.

Q. And who showed the photograph?

A. Detective Vitek.

Q. How many photographs were shown to these
three people?

A. As far as — at the time I was there, only
the one.

Q. And who was that a picture of?

A. It was a picture of the defendant."

At the close of all the evidence in argument on mo-
tions for judgment of acquittal defense counsel again at-
tempted to point out that the in-court identifications
were based on a tainted pre-trial identification. He urged:
"The police officer has testified that all three of these
gentlemen were shown only one photograph. They were
shown one photograph of the defendant at the police sta-
tion. Your Honor well knows that this is highly improper
police tactics." The court said: "Well, there have been
no photographs introduced in evidence and the witnesses
clearly testified that they identified the defendant not
from any photographs whatsoever but from the mere
fact that they actually visibly saw the defendant at the

scene of the crime. So, this is a positive identification and not a photographic or an out-of-court or in-court identification as sometimes is. They relied solely upon the fact that they visibly saw the defendant inside the apartment of the victim here on August 17th. And if that is your reason, we further deny your motion in that respect." Defense counsel asked if the court would refer to the case of *State v. Robert Miller, Jr.*[2] The court said it was familiar with it. "The facts are somewhat different in this case. In this case these witnesses positively identified this defendant, and we think it is not a tainted matter."[3]

We clearly stated the procedure to be followed when identification evidence is challenged in *Smith and Samuels v. State, supra,* at 67-70. We set out a synthesis of it in *Jones v. State, supra,* at 423-424:

"When identification evidence is challenged, the burden is on the accused to show *prima facie* that the extrajudicial procedure was illegal. If he meets this burden the State must show by clear and convincing evidence that it was legal. There is no obligation on the State in introducing a judicial identification to produce any evidence as to an extrajudicial identification except as it may deem advisable to overcome a *prima facie* showing by the accused that the extrajudicial identification procedure was illegal. The question of the legality of the extrajudicial identification procedure is solely for the trial court as is the question whether an illegal extrajudicial procedure tainted a judicial identification. But when the judicial identification is ruled admissible, despite the illegality of an extrajudicial identification, the accused may nevertheless cross-examine the State's judicial

2. It is clear he meant *Miller v. State, supra.*
3. It appeared that there was a positive identification in *Miller* also.

identifying witness at the trial of the general
issue and introduce evidence with regard to the
illegal extrajudicial procedure as part of his
case. Such evidence so elicited goes to the weight
of the judicial identification and the credibility
of the identifying witness, properly matters for
the trier of fact." See also *Miller v. State, supra,*
at 346-348.

We discussed the effect of non-compliance with the pro-
cedural requirements in *Perkins v. State,* 11 Md. App.
527. We found that a defendant is entitled as a matter
of absolute right under *Smith and Samuels* to an evi-
dentiary hearing out of the presence of the jury and a
determination by the trial judge of the question raised
by objection to evidence of identification — that is
whether under the circumstances the extrajudicial view-
ing of the photograph constituted an illegal pretrial con-
frontation tainting the prospective in-court identifica-
tions because violative of the Fourteenth Amendment.
We held that to deny the defendant this absolute right
constituted clear error, not only because it precluded him
from an opportunity to show that the pretrial photo-
graphic viewing procedure was illegal, but also because
it in effect constituted a ruling, based on an insufficient
evidentiary foundation, that the in-court identifications
were not tainted and would, without more, be admitted
in evidence before the jury. *Perkins* is dispositive of the
instant case. We hold that the lower court committed er-
ror requiring reversal of the judgments.

In *Perkins* we observed that we could not sanctify the
violation of the defendant's rights by subscribing to the
State's arguments that it did not really matter because
defendant produced no evidence that the photographic
viewing was illegal and hence did not carry his burden
of showing, *prima facie,* the illegality of the pretrial con-
frontation; or that even if the photographic viewing pro-
cedure was illegal, nevertheless the State adduced evi-
dence at the trial showing that the in-court identifica-

tions were based upon an independent source; or that the extrajudicial photographic identification was in fact legal. We felt that none of those arguments overcame the stark fact that the court wholly precluded the defendant from undertaking to make the requisite preliminary *prima facie* showing that the pretrial photographic viewing procedure violated due process of law and so tainted the prospective in-court identifications as to render them inadmissible in evidence. Here the error is compounded because the evidence that was adduced by appellant on cross-examination of Officer Ruslander indicated that the pretrial photographic viewing procedure was illegal. It was that the police showed only one photograph, that of appellant, to each of the three identifying witnesses; this would seem to be, at the least *prima facie,* impermissibly suggestive. And we note that while it may well be that the evidence adduced was sufficient to show that the identification by Brocious had an independent source, it does not appear to meet the test of such sufficiency as to Reed and Knowles.[4] But in any event, in the circumstances of the conduct of the trial, it is not whether the identifications may have had an independent source. Had the requisite procedures been followed, the appellant would have had the option of placing before the jury or not that there had been a pretrial viewing of photographs and the circumstances surrounding it. As the trial here was conducted, appellant was denied any choice as to whether or not evidence going to the question of the independent source of the in-court identification was to be placed before the jury. On the contrary, the State had the full benefit of the inquiry on the matter being in the presence of the jury.

In holding that the failure to abide by the requisite procedure here constituted reversible error we are not placing form over substance. The procedure enunciated in *Smith and Samuels* is designed to preserve constitu-

---

4. The test is that quoted in *Wong Sun v. United States,* 371 U. S. 471, 488, set forth in *United States v. Wade,* 388 U. S. 218, 241.

tional rights of a defendant. The failure to follow it may, and here did, deny appellant those rights. We are unable to conclude that the error here was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U. S. 18. Appellant is entitled to a new trial and we grant it.

There is no need to reach the other questions presented.

*Judgments reversed; case remanded for a new trial.*