# MILTON THOMAS GREEN a/k/a Angelo Michael Daniels v. STATE OF MARYLAND

[No. 699, September Term, 1976.]

*Decided April 11, 1977.*

The cause was argued before THOMPSON, MOYLAN and MOORE, JJ.

*William J. Chen, Jr., Assigned Public Defender,* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Thomas L. Heeney, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Involved in this appeal are several subtle wrinkles of the Sixth and Fourteenth Amendment law on identification, the resolution of which is implicit in *United States v. Wade*, 388 U. S. 218, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U. S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U. S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967); and *Smith and Samuels v. State*, 6 Md. App. 59, 250 A. 2d 285 (1969), but which have not before been flatly ironed out. The appellant, Milton Thomas Green, was convicted by a Montgomery County jury of armed robbery and attendant offenses. Although he raises six assignments of error, the most significant one is that dealing with identification.

Fundamental to an understanding of the identification problem here (or anywhere) is an appreciation that the suppression hearing contemplated by *Wade-Gilbert-Stovall* is but a specific instance of a more generic constitutional device — a "taint" hearing under the "fruit of the poisonous tree" doctrine. We are here asked to consider, in an identification setting, 1) what is a primary illegality, and 2) what constitutes an exploitation of a primary illegality.

The key dispute in the case was over the criminal agency of the appellant. Pivotal on that question was the in-court identification of the appellant made by the robbery victim. The victim was Commander Rene Alfredo Molina, a member of the Ecuadorian Navy assigned to Washington. Commander Molina's native language is Spanish and it was necessary at trial to employ the services of a Spanish-English interpreter. His, however, was only one of the language problems. At approximately 11:15 p.m. on November 16, 1975, Commander Molina had dropped his wife and three other persons off at their apartment in the Wheaton area of Montgomery County following their return from the Dulles International Airport. Commander Molina drove to the parking area of his apartment complex to park the car for the evening. He noticed that he was being followed by a Datsun sportscar, occupied by two persons. He was ultimately held up at gunpoint by the passenger of that

sportscar and had his own car keys taken from him by the driver of the sportscar. Commander Molina was unable to identify the appellant in at least one pretrial photographic viewing. The critical impasse in this case occurred as, during Commander Molina's testimony, the question of in-court identification drew near.

## An In-Court Identification Was Made

Before focusing in upon that impasse, we leap forward to state that, in our judgment, an ultimate in-court identification was made. The State seeks adroitly to dodge the constitutional issue by urging upon us the factual proposition that no in-court identification was ever made and that the question of procedural inadequacies is, therefore, moot. The premises for our conclusion are these. Commander Molina's narrative definitely establishes that both of his assailants were Negro males. The record further establishes unequivocally that at this critical juncture in the trial, the appellant was the only Negro male in the courtroom. When, therefore, the robbery victim responded in the affirmative that *he did see* one of his assailants (the one who had been the driver of the Datsun sportscar) in the courtroom, this was an effective identification of the appellant notwithstanding the fact that all systems ground to an abrupt halt before the appellant was literally pointed to or identified by name. That the intellectual thought process involved two steps rather than one does not diminish the end product that the appellant was effectively singled out. The process of elimination is within a jury's intellectual competence. We hold that an in-court identification was made and we proceed from that point.

## The Point Was Preserved

Although, as will be more fully discussed hereinafter, sound and unsound arguments mingled confusingly into each other and although legal discussions ran off on unrelated tangents, the appellant clearly sought an exclusionary "taint" hearing before any in-court iden-

tification should be made and equally clearly objected to its denial. The problem in this case is not with the state of the law but rather with the fact that two or three cognate issues blurred together and that the common attention of appellant's counsel, the assistant prosecutor and the trial judge never focused on the same question. The exchanges among all three parties were not sharply responsive and there appears to have been a communications gap as to precisely what the material issue was. The preliminary skirmishing began at the following point:

"MR. MILLER: It would seem to me we have reached a point where Mr. Heeney is going to get into both out-of-court identification and in-court identification. I think we ought to exclude the jury at this time.

THE COURT: I understood that he could not make an out-of-court identification from the pictures. Is that correct?

MR. HEENEY: That is correct.

MR. MILLER: But he now wants to make an in-court identification. I think the lack of the out-of-court identification may very well taint any in-court identification.

THE COURT: We are going to have to take that when we get to it, Mr. Miller. If he wants to bring out as part of the State's case that he could not make this identification from the photo array, I think he is privileged to do that. I don't think that —

MR. MILLER: I understand. But at that point in time when any out-of-court identification proceeds to in-court —

THE COURT: He hasn't asked that question yet. It may be he is not going to ask it.

MR. HEENEY: I am. My position on this, and I think you are right, it is premature, but my position is that once I ask for the in-court identification, it is Mr. Miller's burden to show

somehow or another the failure to make an identification out of court tainted the in-court; the absence of an identification tainted it. I don't think that is what the law is. The law is something has to be wrong, where you have to do something wrong to screw up the identification, to taint it, to make it illegal. That is the issue.

THE COURT: I think, Mr. Miller, that when we get to that point we will have to take that one at a time. I think he can testify that he was shown these photo arrays and that he could not make an identification. That is not objectionable.

MR. MILLER: I think at the point he wants to ask whether or not he can identify him, I would like a hearing out of the presence of the jury on whether or not that is a tainted identification at this point.

THE COURT: All right. We may have to do that. At this point we are not at that point."

To that point, the trial judge was literally correct. No preliminary examination is required before the testimonial assertion that the victim could *not* make an extrajudicial photographic identification. The fact of non-identification is of borderline relevance, at best, and is hardly harmful to a defendant's cause. Following the bench conference, the trial testimony took off briefly in another and unrelated direction. Shortly thereafter, it returned to the subject of the pretrial photographic viewing:

"Q. Fair enough. Let's go to the police station. At what time did you see the photographs at the police station?

MS. SAGASTI [the interpreter]: You mean hour?

BY MR. HEENEY:

Q. Yes.

A. I saw from 1 o'clock at night to almost 3:00, 2:30.

Q. So two or three hours after the robbery?

A. An hour and a half.

Q. Okay. How many pictures were shown to you?

A. Like 200, maybe 300.

Q. For what length of time?

A. Like two and a half hours.

Q. How tired were you?

A. Yes, I was tired.

Q. Who showed the pictures to you?

A. They gave me some boxes to look through.

Q. Who°

A. A police in civilian clothes.

Q. They gave you boxes?

A. Boxes of loose photos.

Q. Did you see the person who was the passenger in those pictures?

A. No, I was not able to identify him.

Q. Did you see the driver in those pictures?

A. No.

Q. Now, did they ever give you a line-up of live bodies to pick out?

A. No. You mean living people standing there?

Q. Yes.

A. No."

Thus far in the testimony, nothing constitutionally untoward had happened, although the State, absent the proper preliminary examination on the admissibility of either an in-court or an out-of-court identification, was running perilously close to the out-of-bounds marker. In a careless instant, the State stepped off sides:

"Q. Do you see in Court now the person who was the driver of the Datsun?

MR. MILLER: Objection.

THE COURT: Tell him he can answer that yes or no.

THE WITNESS: Yes.

MR. MILLER: Approach the bench?"

Under the previously discussed demographic circumstances
in the courtroom at the moment the victim indicated that he
did see "the driver of the Datsun" in the courtroom, an
in-court identification had effectively been made. This first
time around, however, everyone treated the identification as
if it had not yet occurred. Following a prolonged bench
conference, several testimonial diversions and a recess, the
court was ready to conduct a suppression hearing out of the
presence of the jury (albeit, as we have pointed out, an
in-court identification had already effectively been made).
Before that hearing could be held, however, the following
exchange occurred:

"THE COURT: You want to have this hearing?

MR. HEENEY: We can truncate the proceedings
at this point. Mr. Miller is going to make a motion,
as I understand it, to suppress the in-court
identification by this witness. I will not ask, in light
of that, this witness to make an in-court
identification.

THE COURT: I think that satisfies the problem
then, Mr. Miller."

Somewhere in here, there was a communications gap
between the parties because, notwithstanding this
statement of intention, the following took place immediately
upon the resumption of the witness stand by Commander
Molina:

"BY MR. HEENEY:

Q. Commander, with reference to what you told
the jury that happened back on this diagram and
back in November of 1975, do you see anybody in
court that had anything to do with this holdup?

MR. MILLER: Objection.

THE WITNESS: Yes.

MR. MILLER: May we approach the bench?
(Whereupon a discussion was held at the bench,
outside the hearing of the jury, as follows:)

MR. MILLER: I am going to move for a mistrial

at this time. Mr. Heeney specifically said that he wasn't going to ask that question and denied me a suppression hearing, which he said I was entitled to, and now —

MR. HEENEY: I am conceding on the motion.

THE COURT: I don't understand what we have done here now, Mr. Heeney. You have lost me. I understood that you were not going to ask him the very question that you have now asked him in only a different way.

MR. HEENEY: That is not my understanding. If I understand what has happened, I am not going to pursue this problem now that the question has been proposed. I think Mr. Miller's objection is well taken. As I understand it, Your Honor is simply going to rule on it.

THE COURT: Well, I —

MR. MILLER: I don't see how you can get the ink out of the milk now. Your Honor has to declare a mistrial.

THE COURT: I might not understand English very well. As I understand this, you have now asked him the very question that —

MR. HEENEY: The same question as before.

THE COURT: — that we were going to have the out-of-court hearing on.

MR. HEENEY: I am conceding to that, that the motion should be granted, the objection should be sustained.

THE COURT: He already answered the question yes. He just answered the question yes. If you look around the courtroom, there is only one person out there in this courtroom that could possibly be involved in this damn thing. That is the defendant.

MR. HEENEY: It is the same question asked earlier.

THE COURT: It is phrased a little differently. What he has now answered is that he can see

somebody, has seen somebody in this courtroom. The way it was asked this time and the affirmative answer can only point to the Defendant.

MR. HEENEY: He said earlier that he can make an identification of the person that was involved in this thing, and then there was an objection. As I understand that, Your Honor was going to sustain that objection because I wasn't going to pursue it.

THE COURT: I am not going to grant the mistrial, but I think you have asked him two different questions here. Let's go ahead.

MR. MILLER: What can I possibly do now? He has got the question in. He has denied me my suppression hearing. I don't see what else Your Honor can do.

MR. HEENEY: I am agreeing to the suppression hearing. I agree it should be suppressed.

MR. MILLER: He should not have asked the question. The answer is in there.

MR. HEENEY: The judge has to rule on what the question is. I was setting it up so you can sustain it.

THE COURT: Ladies and gentlemen, you go back in the jury room. We have another problem about this matter."

In fairness to the Assistant State's Attorney, we do not infer that he intentionally misled the court. As in so many courtroom wrangles, the spark was not a legal problem but a language problem. People talk at cross-purposes because although they use the same words, they have different meanings in mind. In the mind of the hearing judge, of the defense attorney and, incidentally, of this Court, an in-court identification was made. In the mind of the Assistant State's Attorney, an identification was not yet made and would not have been made unless and until he had asked the follow-up question, "Will you point to that person?" and the pointing had in fact occurred. Nobody defined his terms. The appellant and the State were at odds not over the law of

identification but over the meaning of "identification." As is so frequently true in courtroom disagreements, what is needed is not more sophisticated law but a little elementary semantics. Whatever the cause, however, the appellant was denied a right to which he was entitled and which he had timely sought.

The appellant was erroneously denied a suppression hearing on the constitutionality of the pretrial identification procedures which arguably might have tainted the courtroom identification. Because of the blurring of issues as revealed by trial transcript and by argument before us, we would clarify precisely how we arrive at this conclusion.

### 1. The Circumstances of an In-Court Identification Are Not the Subject for a "Taint" Hearing

The primary thrust of the appellant's argument was not and is not well taken. Indeed, the emphasis upon this unsound argument helped to divert trial attention from the appellant's secondary thrust, which was valid and which controls our decision. Under the unsound theory, the appellant argued vigorously that 1) his presence as the only Negro in the courtroom and 2) his seating at the trial table created impermissibly suggestive circumstances for the making of the in-court identification and that he should have been permitted a suppression hearing in order to establish this.

At such a hearing, he proffered to use the fact of pretrial *non-identification,* by way of contrast, to buttress his position that the in-court identification could not have been made but for its own inherent suggestive circumstances.[1] He was not alleging impermissibly suggestive *pretrial* procedures as the cause of the later in-court identification. He was alleging, rather, impermissibly suggestive *trial* procedures as its own self-contained "cause *and effect.*" The appellant was maintaining not that the courtroom

1. The contrast between non-identification then and identification now would only be relevant, of course, if it were shown that the appellant's picture had been in the photographic array.

identification was the "fruit of the poisonous tree" but rather that it was the "poisonous tree" itself. Under *Wade-Gilbert-Stovall,* a suppression hearing is not available for such a purpose. An in-court identification, as any other evidence, civilly or criminally, may be tested and probed by the traditional device for such testing and probing — the use of cross-examination. ("Where would you assume a defendant would sit during the course of his trial?" "Before pointing so dramatically to my client, you had earlier testified that your assailant was a black male; I now ask you to look around this courtroom and tell us precisely how many black males are present in the room. No further questions, Your Honor!" "Before so easily picking out the defendant as he is seated here at the trial table, isn't it a fact that you totally failed to pick out his photograph when it was intermingled with the photographs of other persons?" "How can you remember so well ten months later a face that you saw in the dark for no more than 30 seconds?", etc.) What happens in the courtroom is open for judge and jury to see and does not call for the Sixth Amendment's special ventilation of musty and secret station house proceedings. Thus, for the primary reason for which the appellant sought the exclusionary hearing, his grounds were not well taken and he was not entitled to such "taint" hearing.

## 2. The Circumstances of a Pretrial Identification Are the Subject for a "Taint" Hearing

In a secondary and alternative line of reasoning, however, the appellant did articulate the proposition that there might arguably have been impermissibly suggestive procedures employed at various pretrial attempts at identification and that they may have infected the courtroom identification:

> "[I]t is my understanding that where there have been pre-trial identification procedures, such as showing him a photographic array, that it would be incumbent upon the State to show that any such pre-trial photographic arrays did not taint any in-court identification.

I would ask that the jury be excluded and we go into the question as to whether or not any in-court identification by this witness is tainted."

It is clear that the appellant lodged a timely objection to the in-court identification. It is clear that he explicitly requested a preliminary examination, out of the presence of the jury, on the issue of admissibility. It is clear that he was entitled to such a hearing. The mandate of *Wade-Gilbert-Stovall* was articulately summarized and incorporated into the law of this State by Judge Orth in *Smith and Samuels v. State*, 6 Md. App. 59, 67-68, 250 A. 2d 285:

### "THE PROCEDURE UPON CHALLENGE OF EVIDENCE OF IDENTIFICATION

Evidence of the identity of the defendant may be challenged by a motion to exclude or suppress such evidence made before or during trial or by an objection to the evidence when it is offered. Md. Rules 725, 522. . . . When the determination of the admissibility of the challenged evidence is made during a trial before a jury, evidence on the issue shall be received out of the presence of the jury. At the hearing on the issue raised by the challenge the burden is on the defendant to show, *prima facie*, that the pre-trial confrontation or viewing of photographs was illegal, and if he so shows, the burden shifts to the State to show by clear and convincing evidence that it was legal. If the court finds that the State has met its burden and that the pre-trial confrontation or viewing was legal, an in-court identification by the witness present at the pre-trial confrontation or viewing is admissible as substantive evidence. And if such witness made a pre-trial identification, his testimony to that effect is so admissible. . . . If the court finds that the pre-trial confrontation or viewing was illegal, any and all evidence of the pre-trial identification is *per se* inadmissible. The burden is then on the State to

establish that the in-court identification offered had a source independent of the illegal pre-trial confrontation or viewing."

It is clear that the suppression hearing is designed to deal with either or both of two distinct admissibility issues — 1) the admissibility of the pretrial identification (photographic, lineup or otherwise) and 2) the admissibility of a subsequent in-court identification which may or may not be the proximate result of a tainted extrajudicial identification. The first of the two admissibility issues is not before us in this case because no pretrial identification was made and hence no pretrial identification was offered in evidence. The exclusionary hearing was nonetheless still mandated to determine what, if any, effect the pretrial circumstances may have had upon the in-court identification.

For an in-court identification to be suppressed, two things must be shown:

(1) *That the extrajudicial identification procedure was the proximate cause of the ensuing in-court identification.* (Even if there has been a tainted, to wit, impermissibly suggestive, extrajudicial identification procedure, the in-court identification may still be admissible if it is shown to be not the product of the earlier, tainted identification procedure. Once the primary taint is shown, of course, the later in-court identification is presumptively its product and the burden is upon the State to show an independent source therefor.);

*AND*

(2) *That the extrajudicial identification procedure was tainted.* (Even if the in-court identification is the proximate result of an earlier extrajudicial identification procedure, it is not inadmissible simply because it is a mere effect unless the cause for such effect was, indeed, tainted. It may, under such circumstances, be redundant and may not, therefore, have very much independent weight but that does not affect admissibility *per se.*)

The appellant should have had the opportunity to explore this possibility of taint. Thus, for this secondary reason for which the appellant sought the exclusionary hearing, his grounds were well taken and he was erroneously denied a "taint" hearing.

### 3. The Primary Illegality May Be an Impermissibly Suggestive Proceeding Producing No Pretrial Identification

Distracted by their proper response to the appellant's leading argument, the court (and the assistant prosecutor) gave too short a shrift to his secondary point. They were content to dismiss it with the surface observation that there was no pretrial identification:

> "THE COURT: It obviously, I would think, cannot be tainted on a lineup theory, because there has been no lineup. I don't see how it can be tainted on any photo array basis because he hasn't made any identification based on the photo array."

That misses the mark. It is perfectly conceivable that one or more pretrial identification proceedings could be so impermissibly suggestive as to be the cause of a later in-court identification, whether they in fact caused a pretrial identification or not. When we look to the question of tainted cause, we are looking to all of the circumstances of the pretrial lineup or showup. The mere fact that no pretrial identification was there made is not, *ipso facto*, dispositive of the causative influence which the proceeding itself may have had upon a later in-court identification. Once a witness has been exposed to possibly contagious and contaminating causation, a long-term infection could surface at the trial stage even if no ill effects were obvious in the immediate, extrajudicial wake of the exposure. When we examine the pretrial identification procedures, it is the process and not the immediate product that counts. We look to exposure and not incubation period.

The distinction here made may seem subtle to the point of being metaphysical but it is a necessary distinction for a

case just such as this — where there is a pretrial identification procedure but where there is no pretrial identification. Careless linguistic shorthand generally refers to the possibility that "the pretrial identification *caused* the courtroom identification." That, of course, is not the way the causative process works. The *cause* is the possibly impermissive suggestiveness of the pretrial identification procedure itself. It is the very act of dangling the bait and not the witness's subsequent act of snapping at the bait. The ensuing acts of pretrial identification and courtroom identification are both *effects*, short term and long term, flowing from the same *cause*. They are not in a *cause and effect* relationship to each other. Theoretically at least, the same *cause* might produce 1) both a short-term effect and a long-term effect; 2) a short-term effect but no long-term effect; 3) a long-term effect but no short-term effect; or 4) neither a short-term effect nor a long-term effect. Although it is evidence upon the question, the absence of a short-term *effect* does not, *ipso facto*, negate the *cause*.[2]

Had there been no pretrial exposure of any sort, an exclusionary hearing would not have been mandated. In this case, however, there clearly had been significant exposure and significant attempts at identification. (It was established that the victim had viewed between 200 and 300 photographs for a period of between an hour and one-half and two hours. Whether or not other efforts were made at identification was not developed.) The appellant was entitled to explore those circumstances. He was erroneously denied that opportunity.

### 4. The After-the-Fact Revelation of "No Prejudice"

The prescribed procedural sequence is not, like Beauty, its own excuse for being. It exists to serve a purpose. Notwithstanding the procedural error in this case, it remains to be seen whether the undergirding and animating

---

**2.** Although a pretrial procedure may consist of both a question and an answer, the *cause* is only the impermissibly suggestive *question*. The distinct phenomenon of the *answer* (or non-answer) is simply the first generation *effect* (or non-effect) flowing (or not flowing) from that *cause*.

purpose of the rule was, in the net result, ill-served. The procedural sequence was unquestionably out of kilter. We must still inquire whether this appellant in the circumstances of this case actually suffered any prejudice, or plausible possibility of prejudice, thereby.

What we are here considering is not the question of "harmless error." That constitutional phenomenon comes into play when there has been both an error and some ascertainable prejudice of at least a minimal variety as a result of that error. It then measures the impact of that prejudice in relation to the other evidence of guilt and requires the constitutional fact finder to ask whether it can be said, beyond a reasonable doubt, that 'the wrongfully admitted inculpatory evidence did not contribute to the jury's verdict. *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California*, 395 U. S. 250, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969).[3] We are not here making such an assessment. In the "harmless error" setting, the error does produce some substantive prejudice. We are here dealing with a very different type of threshold question — that of whether a mere procedural error actually produced any substantive error (or prejudice) at all. If the evidence that came before the jury was in fact proper, did the mere mix-up in timing make any difference at all or did the potential error, by a stroke of luck, become moot?

---

**3.** If "harmless error" were, indeed, the issue before us, we would conclude that any arguable error in this case was harmless beyond a reasonable doubt. The whole issue of identification procedures went to the question of whether the appellant was at the crime scene and not to the question of what he did there. The appellant did not dispute his presence at the crime scene. The abandoned car in which Commander Molina's assailants left the crime scene was discovered by the police within minutes after the crime. A pair of abandoned tennis shoes in that car established the scent which a trained police dog followed, through the woods, to the very bush wherein the appellant was hiding. His codefendant, who had left a fingerprint in the car, was found nearby. A loaded .32 caliber revolver, similar to that used in the robbery, was also found in a nearby bush. The appellant himself led the police to a spot on the parking lot near where the appellant had thrown away Commander Molina's car keys. The keys were there recovered. The appellant gave a statement to the police, to the admission of which he made no objection whatsoever at trial, in which he freely acknowledged his presence at the crime scene but in which he placed all the criminal blame upon his companion and codefendant. The questioned identification procedure, even if it had yielded a prejudicial result, went to an undisputed fact.

The State argues persuasively the *nunc pro tunc* theory that the pretrial circumstances were thoroughly explored and were proved to be constitutionally innocuous *after the fact* of in-court identification, even if they had not been fully explored *before the fact.* We agree that the circumstances under which Commander Molina was shown several hundred photographs over a period of an hour and a half shortly after the crime occurred were thoroughly explored and did not remotely hint of anything impermissibly suggestive. The pretrial identification procedure was revealed to be totally untainted. Had the proper sequence been followed, the ultimate in-court identification was indisputably proper. While we strongly disapprove of a procedural risk being unnecessarily taken, the risk in this case, by a stroke of good fortune, did not produce any dire consequences. Even in a harmless error situation, the jury receives some evidence which it should not have received; in this case, the jury received only evidence which it should have received. The worst that can be said is that it received it twenty minutes early.

What happened, in effect, was that a cat was let out of the bag prematurely. In such a circumstance, if an after-the-fact examination of its pedigree reveals it to be tainted, it cannot effectively be put back in the bag again and a mistrial may, indeed, be called for.[4] If, on the other hand, the after-the-fact examination of the pedigree reveals it to be utterly untainted, no harm has been done. The cat is out and the cat deserves to be out. All that has happened is that we have suffered a needless but short-lived little scare before reassurance is ultimately forthcoming.

Our only pause in this regard is a first reading of *McGilton v. State,* 12 Md. App. 174, 278 A. 2d 76. Its language, at 12 Md. App. 183-184, is broad:

> "We found that *a defendant is entitled as a mat-ter of absolute right* under *Smith and Samuels to an evidentiary hearing out of the presence of the jury*

---

4. Even here, the assessment of the impact, in the context of a particular trial, is left to the wise discretion of the trial judge who is best positioned to assess such impact.

and a determination by the trial judge of the question raised by objection to evidence of identification — that is whether under the circumstances the extrajudicial viewing of the photograph constituted an illegal pretrial confrontation tainting the prospective in-court identifications because violative of the Fourteenth Amendment. . . .

In *Perkins* we observed that we could not sanctify the violation of the defendant's rights by subscribing to the State's arguments that it did not really matter because defendant produced no evidence that the photographic viewing was illegal and hence did not carry his burden of showing, *prima facie*, the illegality of the pretrial confrontation; or that even if the photographic viewing procedure was illegal, nevertheless the State adduced evidence at the trial showing that the in-court identifications were based upon an independent source; or that the extrajudicial photographic identification was in fact legal. . . . [I]n any event, in the circumstances of the conduct of the trial, *it is not whether the identifications may have had an independent source. Had the requisite procedures been followed, the appellant would have had the option of placing before the jury or not that there had been a pretrial viewing of photographs and the circumstances surrounding it.* As the trial here was conducted, *appellant was denied any choice as to whether or not evidence going to the question of the independent source of the in-court identification was to be placed before the jury.* On the contrary, the State had the full benefit of the inquiry on the matter being in the presence of the jury." (Emphasis supplied)

Notwithstanding the absolute tone of this language, a cardinal rule of case construction at the common law is that no statement, for purposes of ascertaining a holding at least,

is ever to be wrenched loose of its generating factual context. The facts of *McGilton* are not as broad as its language. On its facts, *McGilton* was unquestionably correctly decided and we adhere to it steadfastly. In *McGilton*, the "cat was let out of the bag" prematurely. An after-the-fact examination of "taint" did reveal that one at least of the questioned identifications was untainted — not because of the absence of primary taint but rather because the courtroom identification had an independent source. The defendant was, nevertheless, placed at the distinct substantive as well as tactical disadvantage of either submissively accepting the untested courtroom identification or of disclosing to the jury, in the course of the after-the-fact "taint" examination, the damaging evidence that a pretrial identification (tainted and, therefore, properly excludable) had actually been made. Under the circumstances, the procedural misadventure did not become moot but worked affirmative mischief. The defendant was on the horns of a dilemma. In the course of proving the cleanliness of one identification (the in-court one) there was uncovered before the eyes of the jury another unclean identification (the pretrial photographic viewing). The defendant had to choose between one possibly bad identification and one definitely bad identification. He was in a "no win" situation. *Under those circumstances, McGilton* properly reversed the conviction. If its language was overbroad, it is because *those are not always the circumstances* when a preferred procedural sequence gets out of kilter. If an after-the-fact examination reveals that the premature courtroom identification was untainted *and* if the very process of the after-the-fact examination does not harm the defendant in any way, it would be exalting form over substance automatically to order a reversal. It would work the absurd result that an untainted pretrial identification, which the State could have introduced in chief but did not, would trigger a reversal if it came in later as part of the testing of the pedigree of an in-court identification. That cannot be. We do not order reversals or require mistrials when a jury ends up receiving nothing but competent, relevant, material and constitutionally

unoffending evidence. To the extent to which *McGilton* suggests otherwise, *McGilton* is definitely not controlling.

The overly broad language of *McGilton* was, in turn, taken in part from earlier and also overbroad language in *Perkins v. State,* 11 Md. App. 527, 275 A. 2d 517. Again, we agree that *Perkins* was correctly decided *on its facts* and we adhere to it firmly. Its facts, however, were even more confining than those in *McGilton.* In *Perkins,* the courtroom identification came in without a before-the-fact taint hearing, which had been requested by the defendant. Then the defendant himself repeatedly sought an after-the-fact taint examination and was cut off every time he tried to explore the matter before the jury. The error in *Perkins* was not one involving procedural sequence at all but rather the utter foreclosure of any taint hearing, before or after the fact.

The rule of *Wade-Gilbert-Stovall* and of *Smith and Samuels v. State* is a sound one, one that produces proper results in proper sequence, and one that is always to be followed. When, however, as sometimes happens in the din and confusion of courtroom battle, the rule misfires, is reversal automatically and rigidly called for? We think not. What is called for is a more searching analysis.

A rule does not exist for its own sake alone; it exists to perform an underlying function. What is required of appellate review is not blind and doctrinaire (and, therefore, easy) adherence to the letter of a rule but a functional analysis in terms of the rule's purpose. We look to what happened, not just to how it happened. We look to substance, not form. Notwithstanding the "broken play," was the function which the rule was invented to perform ultimately ill-served or well-served? The "broken play," which could be disastrous, sometimes works out all right.

A functional analysis simply requires us to think a problem through to its logical conclusion. In this regard, the decisional process, in undifferentiated totality, is sometimes hard to come to grips with. To locate and to pinpoint a problem area, it is helpful to break the thought process down into its component parts. We sometimes need to construct a

model. If a courtroom identification is prematurely made before the opportunity for a timely requested "taint" hearing (if the cat is prematurely let out of the bag), is a mistrial called for? The answer is, "Maybe, yes, and maybe, no." There are two possibilities:

I. If the after-the-fact examination reveals that there was a primary illegality and that the courtroom identification was the tainted product of that primary illegality, a mistrial is quite possibly in order.[5]

II. If, on the other hand, the after-the-fact examination reveals either that there was no primary illegality or that the courtroom identification had an independent source, has everything been cured? Again, the answer is, "Maybe, yes, and maybe, no." Again, there are two possibilities:

A. If in the course of the after-the-fact examination, nothing is brought out which is harmful to a defendant's cause, all is well.

B. If, on the other hand, in the course of the after-the-fact examination, facts are brought out (as in *McGilton*) which could harm a defendant's cause, is a mistrial called for? Again, the answer is, "Maybe, yes, and maybe, no." Again, there are two possibilities:

1. If the harmful facts (as in *McGilton*) are heard by the jury (which jury would not have heard such harmful facts had the proper procedural sequence been followed), a mistrial may well be in order.[6]

2. If, on the other hand, the trial judge (in order to explore the necessity or

---

5. See note 4 above.
6. See note 4 above.

> non-necessity for a mistrial and precisely to avoid *McGilton*-type problems in the course of that exploration) has held the after-the-fact "taint" hearing out of the presence of the jury, all is yet well.

Since the present case is an instance of IIA above, all is well.

### Compelled Self-Incrimination

One of the appellant's remaining contentions is intellectually interesting. Its launching pad is the Fifth Amendment's command that, "No person . . . shall be compelled in any criminal case to be a witness against himself." The problem is that the nexus between the constitutional starting point and the present claim "is narrowed to a filament." [7] The appellant lays down a broad enfilade of objections to the closing argument and rebuttal of the assistant prosecutor, including charges that the prosecutor actually gave testimony in the course of jury argument, attacked his own evidence, improperly attacked defense counsel and commented upon the appellant's failure to testify. Although in reviewing the argument generally, we see nothing intemperate or beyond the pale of fair comment under *Wilhelm v. State*, 272 Md. 404, 326 A. 2d 707, we note that the only subcontention properly reserved for appellate review by timely objection is that dealing with the ostensible comment upon the failure of the appellant to testify. The State was arguing, on the basis of Commander Molina's testimony, that the appellant fully participated in the robbery. The appellant was arguing, on the basis of his statement given to the police, that he never anticipated that his companion would perpetrate a robbery and was surprised when it eventuated. In this context, we deem the assistant prosecutor's comments to have been both relevant and necessary as he urged upon the jury the credibility of

7. Justice Cardozo in *Snyder v. Massachusetts,* 291 U. S. 97, 122, 54 S. Ct. 330, 78 L. Ed. 674, 687 (1934).

the inculpatory version of the facts and the corresponding incredibility of the defense version of the facts:

> "Now, what this whole case comes down to is do you believe his statement, given to a police officer, that he wasn't really involved; or do you believe the witnesses from the witness stand as to what happened? That is really where it is at. Let's discuss this.
>
> First of all, the victim, when he told you what happened, as to what the passenger did and what the driver did, was under oath. That victim was cross examined by Mr. Miller. That victim had nothing to gain. That is a key point in this case — he had nothing to gain by lying, by saying somebody else did it. I mean, he was here to tell the truth. He was a good witness. He was sure of what he said. He had that positiveness in him. That is the credibility you want; that is the credibility you can rely on.
>
> What about the Defendant? Well, first of all, his statement is a hearsay statement. The evidence is that it is not under oath."

Even more to the point, we do not deem this argument to have been comment upon the appellant's failure to take the witness stand. Appellate claims of the nature of the one here being made sometimes become so strained as they prospect for every arguable and remote allusion or inference that can be extracted from a jury speech that we must periodically go back to the constitutional point of departure in order to regain our sense of reality. What is proscribed by the Fifth Amendment is compelling one to give evidence against himself. That protection was deemed absorbed into the Due Process Clause of the Fourteenth Amendment and made binding upon the states by *Malloy v. Hogan,* 378 U. S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964). That protection was extended radically when it was held to prohibit not only the compulsion to give testimony but even comment by the state

upon the failure of a defendant to take the stand voluntarily. That extension came in *Griffin v. California,* 380 U. S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965). To get the feel again for the type of thing prohibited by *Griffin v. California,* it pays to look to the explicit and unequivocal quality of the argument there condemned:

> " 'The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her.
>
> 'What kind of a man is it that would want to have sex with a woman that beat up if she was beat up at the time he left?
>
> 'He would know that. He would know how she got down the alley. He would know how the blood got on the bottom of the concrete steps. He would know how long he was with her in that box. He would know how her wig got off. He would know whether he beat her or mistreated her. He would know whether he walked away from that place cool as a cucumber when he saw Mr. Villasenor because he was conscious of his own guilt and wanted to get away from that damaged or injured woman.
>
> 'These things he has not seen fit to take the stand and deny or explain.
>
> 'And in the whole world, if anybody would know, this defendant would know.
>
> 'Essie Mae is dead, she can't tell you her side of the story. The defendant won't.' " 380 U. S. at 610-611.

The direct and devastating attack upon the failure of a defendant to take the stand, condemned by *Griffin v. California,* bears no resemblance whatsoever to a proper attack upon an exculpatory unsworn statement, from which attack a juror might speculatively infer that the appellant did not testify in his own defense. A jury hardly needs a remote allusion to a non-happening (the failure of the appellant to testify) of which it is fully aware. At work here is an interesting constitutional phenomenon. We begin with

the sound principle that no one should ever be compelled to give evidence against himself. Extrapolating from that, we extend the application of the principle so as to prohibit the prosecutor from arguing to the jury the proposition that they can and should infer a guilty state of mind from testimonial silence. That extension, in the hands of advocates, becomes a new point of departure and they extrapolate from it the arguable further extension that no one should ever mention to the jury, even in the most neutral of terms, the fact (a rather obvious fact even without mention) that the defendant has not testified in his own behalf. We are now asked to take that as yet a new point of departure and to make yet a further extension. The appellant urges upon us the proposition that even an otherwise legitimate argument on the respective weights of the State's evidence and the defense evidence will engage the gears of the Fifth Amendment and fall under the constitutional prohibition if a jury might conceivably deduce from that argument the fact that a defendant did not take the stand.

We decline to do so. At the point where even the ripples of ripples have ripples, we have lost all contact with our constitutional origins. This process of extension was roundly criticized by Judge Henry J. Friendly, who described it as:

"... the domino method of constitutional adjudication ... wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation." [8]

Forcefully to contrast, in the course of legitimate argument, the sworn testimony of Commander Molina, who had no axe to grind, with the unsworn and self-serving denials made by the appellant to the police does not amount, in our judgment, to compelling an accused to be a witness against himself. The prosecutor's argument was constitutionally unoffending.

8. Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 Cal. L. Rev. 929, 950 (1965). See also *Miranda v. Arizona*, 384 U. S. 436, 514, 86 S. Ct. 1602, 16 L.Ed.2d 694, 746-747 (1966). (dissenting opinion by Harlan, J.).

## The Right to an Impartial Jury

One intriguing contention raised by the appellant makes, in our judgment, a mountain out of a molehill. At an earlier occasion in the trial, the individual jurors had had note pads and were requesting the right to take notes individually. At one point it was determined that only the foreman would take notes and the pads were all passed in. During the final stages of the case, preparatory to retiring for their deliberations, the jurors got their note pads again. It was ultimately revealed to the court that one of the note pads picked up by one of the jurors contained upon it the single, written word "Guilty." Upon this basis, the appellant moved for a mistrial on the ground that someone had improperly communicated with the jury and may thereby have influenced the jury's verdict. The trial judge denied the motion for a mistrial. We cannot say that he abused his discretion in this regard.

For many reasons, not the least of which is the unending litigation which is generated, it is unfortunate when such accidents occur. When, however, there is no purposeful fault discernible on the part of anyone, to suggest that a single word written on a scratch pad is capable of having a hypnotic and talismanic influence over a juror, engendering some Pavlovian, conditioned reflex capable of overcoming days of listening to testimony and hours of listening to argument and jury instruction is simply preposterous. If the American jury is, indeed, that suggestible, there is serious question as to the continuing viability of the whole institution of trial by jury. Again, we need to maintain contact with constitutional origins. Involved is the command of the Sixth Amendment that, "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury."

The constitutionally requisite impartiality of the jury simply did not disintegrate because someone saw the word "Guilty" written on a pad of paper. The word did not communicate some forbidden piece of information to the jury. Neither did it possess the occult power to bewitch them

or to cast a spell, any more than an unruly shout from the back of the courtroom or a bit of graffiti on a jury room wall could cast a fatal spell. A juror deemed capable of resisting and evaluating an hour or more of persuasive rhetoric at the hands of a skilled trial advocate, who drums into them his apocalyptic message of "Guilty! Guilty! Guilty!" does not suddenly "cave in" at the sight of a single word on a scratch pad. A mishap of this sort was unfortunate but fundamentally trivial. The decision not to abort a two-day trial investment for so light and transient a cause was not improper.

### The Other Contentions

The other contentions need not detain us long. The appellant condemns the failure of the trial judge to instruct the jury on the law of accessoryship after the fact. Since the evidence pointed indisputably to the guilt of the driver of the Datsun sportscar (whoever the identification process reveals that person to have been) as a principal and not an accessory after the fact, the refusal of the judge to charge the jury on a point of law not supported by the evidence was proper.

The appellant also attacks the jury instruction on the subject of using a handgun in the commission of a felony. He now objects to that part of the instruction dealing with the gun being in operable condition. The only objection he made at the trial, however, was to the instruction in an entirely different regard and only that, therefore, will be considered by us to have been preserved for appellate review. The nature of the objection lodged at the trial level dealt with that part of the charge which informed the jury that a defendant could be guilty if he was a full participant in the armed robbery even though he did not manually handle the gun himself. In looking at the charge as a whole in this regard, we think it adequately stated the applicable law and was unexceptionable.

The appellant's final contention is that the evidence was not legally sufficient to let the case go to the jury on the charges of using a handgun in the commission of a felony

538

and transporting a handgun in a motor vehicle. His argument in this regard is predicated upon his position that he was, at most, an accessory after the fact and not a principal. Since the testimony of Commander Molina himself was sufficient to establish the guilt of the appellant as a principal, the predicate for the argument falls.

*Judgments affirmed; costs to be paid by appellant.*