742 A.2d 28

**Mantice PARKER**

v.

**STATE of Maryland.**

**No. 1574, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 7, 1999.

Charles Gayle (Jennifer P. Lyman, Assigned Public Defender, on the brief), Washington, DC, for Appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for Appellee.

Argued before MOYLAN, SALMON and BYRNES, JJ.

BYRNES, Judge.

Mantice Parker, appellant, was convicted by a jury in the Circuit Court for Baltimore City of second-degree assault, use of a handgun in the commission of a crime of violence, and unlawfully carrying a handgun. After merging the weapons offenses, the lower court sentenced appellant to ten years imprisonment for the assault conviction and a consecutive fifteen-year term for the handgun violation, with all but ten years suspended and the first five years to be served without the possibility of parole.

Appellant presents the following questions for review, which we have rephrased:

I. Did the trial court err in rejecting appellant's reasons for two peremptory strikes and reseating the stricken jurors?

II. Did the trial court err in denying appellant's motion for mistrial?

III. Did the trial court err in admitting certain hearsay statements into evidence under the "excited utterance" exception to the rule against hearsay?

IV. Did the trial court err in admitting into evidence a witness's photographic identification of appellant and her written statements implicating appellant in the commission of the crime?

For the following reasons, we answer these questions in the negative. Accordingly, we shall affirm the lower court's judgments.

## FACTS

This case stems from a shooting that occurred on the evening of October 14, 1996, in Baltimore City. At around 7:30 p.m., a young black male driving a blue Ford Taurus station wagon pulled into the intersection of East 21st and Barclay Streets, and parked. The driver, who was the sole occupant of the vehicle, got out of the station wagon and ran toward another black male, Jamal Jones, who was in the 2100

block of Barclay Street. The driver was brandishing a handgun. A chase ensued, and Jones ran into a rowhouse at 2111 Barclay Street. Several children and adults were present in that building. The driver followed Jones into the building and fired several rounds, hitting Jones once in the arm and striking Angelena Richardson, one of the children, several times in the arm and back. The driver then returned to the Taurus station wagon and drove away. Both victims survived the incident.

Within minutes after the shooting, the police arrived and witnesses gave them a physical description of the gunman and his vehicle. They also gave the police a partial Maryland license tag number for the vehicle. A search of the Maryland Vehicle Administration's records revealed that appellant had been issued a similar license tag number for a Ford Taurus, and that his vehicle matched the description of the one seen by the crime witnesses.[1] A witness interviewed by the police on the night of the shooting viewed a photographic array and identified appellant as the gunman. That witness also gave the police two written statements implicating appellant in the crime.

Additional facts will be recited as necessary to our discussion of the issues.

## DISCUSSION

### I

Appellant contends that the trial court incorrectly applied the legal test for determining whether he exercised his peremptory strikes in an impermissibly discriminatory manner. In *Gilchrist v. State*, 340 Md. 606, 667 A.2d 876 (1995), the Court of Appeals adopted the three-step procedure articulated by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 93–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), for a trial court to address a litigant's claim that peremptory challenges have

---

1. The witnesses reported that the license tag number was "C-missing letter-W dash 745." Appellant's license tag number was CXW 743.

been exercised improperly to exclude prospective jurors solely on the basis of race.

First, the objecting party must make a *prima facie* showing that the other party has exercised its strikes on a discriminatory basis. *Gilchrist,* 340 Md. at 625, 667 A.2d 876. Second, after the trial court is satisfied that the complaining party has established a *prima facie* case, the burden shifts to the party exercising the strikes to come forward with neutral, non-discriminatory explanations for them. *Id.* at 625–26, 667 A.2d 876. "The explanation must be neutral, related to the case to be tried, clear and reasonably specific, and legitimate." *Stanley v. State,* 313 Md. 50, 78, 542 A.2d 1267 (1988), *appeal after remand,* 85 Md.App. 92, 582 A.2d 532, *cert denied,* 322 Md. 240, 587 A.2d 247 (1991). "[T]he reason offered need not rise to the level of a challenge for cause," however, because "[a]t this stage of the inquiry, the issue is the facial validity of the ... explanation." *Gilchrist,* 340 Md. at 626, 667 A.2d 876 (citation omitted).

Finally, the trial court must determine whether the complaining party has met the burden of proving purposeful discrimination. *See Stanley,* 313 Md. at 62, 542 A.2d 1267. Here, the decisive question is whether the striking party's race-neutral explanation is credible. *See Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)(plurality opinion). The trial court must evaluate "each strike ... in light of the circumstances under which it was exercised, including an examination of the explanations offered for other peremptory strikes." *Chew v. State,* 317 Md. 233, 245, 562 A.2d 1270 (1989). At this juncture, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)(per curiam), *on remand,* 64 F.3d 1195 (8th Cir.1995). The complaining party bears the ultimate burden of proving intentional discrimination and therefore should be afforded "an opportunity to demonstrate that the reasons given for the peremptory

challenges are pretextual or have a discriminatory impact."
*Gilchrist,* 340 Md. at 626, 667 A.2d 876.

 In reviewing rulings on *Batson* challenges, we are cognizant that the "determinations made by the trial court are essentially factual, and therefore are accorded great deference on appeal." *Id.* at 627, 667 A.2d 876 (citation and internal quotation marks omitted). We "will not reverse a trial judge's determination as to the sufficiency of the reasons offered unless it is clearly erroneous." *Id.* (citation omitted).

In the case *sub judice,* during the seating of the jury, and after the parties had exhausted their peremptory challenges, the State complained that appellant improperly had exercised his strikes to remove white prospective jurors from the panel. The State moved the court to reseat the jurors it contended appellant had stricken impermissibly on the basis of race unless appellant articulated an "acceptable explanation" for the strikes. The following colloquy then took place among counsel and the trial court, at the bench:

[APPELLANT'S COUNSEL]: Can I respond?

THE COURT: Yes [counsel], you owe me an explanation. *Start with [juror number] 26. Juror number 26* was seated originally in seat 8.

[APPELLANT'S COUNSEL]: She is employed by the Criminal Assignment Office. I think that that is somewhat problematic. I don't want a person employed by Criminal Assignment sitting on my jury.

THE COURT: All right.

[PROSECUTOR]: May I answer that?

THE COURT: You may.

[PROSECUTOR]: Your Honor, the juror answered that question and said [that] she could be fair so I find that to be an unacceptable reason.

THE COURT: I find it unacceptable as well. Okay. Go ahead.

[APPELLANT'S COUNSEL]: *Juror number 27,* I struck people who had doctors['] appointments because I don't

want somebody who has a doctor's appointment worrying about that [rather] than my trial.

[PROSECUTOR]: I find that unacceptable because this Court made it clear to the venireman, that the Court would go out of its way to sit that person with doctor[s'] appointments.

[APPELLANT'S COUNSEL]: Doesn't mean that person will not be preoccupied with the fact that they have a doctor's appointment scheduled [rather] than paying attention to the details of the trial, that [juror number 27] has made enough of a point to approach the bench about it means [that he is] thinking about it.

\* \* \* \*

[I am] [t]alking about somebody more concerned about their health than the trial. It is enough of a concern for me.

[APPELLANT'S COUNSEL]: They are people who said [that] they could be fair.

THE COURT: I will put a question mark on that.

\* \* \* \*

THE COURT: What about *juror number 30?*

[APPELLANT'S COUNSEL]: Judge, with that person, ever since the person was seated in the jury over there, I kept an eye on him and he kept looking back in our direction and I felt uncomfortable about him as a juror.

\* \* \* \*

THE COURT: [What about *juror number* ] *38* [?]

[APPELLANT'S COUNSEL]: I struck that person because, again, her position as a physician, she indicated to the Court [that] if she didn't work, somebody was going to have to work a double shift. . . . I am more interested in having somebody not worried about someone working a

double shift for them than if somebody is going to be a juror on a panel.

\* \* \* \*

THE COURT: The physician lady, I'll give you the benefit on that. The physician lady which was [juror number] 38, juror number 11, don't bring her back. [Juror number] 30. I don't have a problem. *That was a neutral reason.* [Juror number] 29 was a *neutral reason.* So as we stand, only [the explanation for striking juror number] 26 is unacceptable. We'll go with that.

[PROSECUTOR]: Even though [juror number 26] is exposed to the criminal docket every day of the week?

THE COURT: So am I. She never —— no. I think that is unacceptable. I really do. That is an unacceptable reason.

\* \* \* \*

[PROSECUTOR]: What about the one you had a question mark on [*i.e., juror number 27* ]?

THE COURT: Well—

[PROSECUTOR]: [The juror's doctor's appointment] would not interfere.

THE COURT: [His doctor's appointment] was [scheduled for] Tuesday. Also, [juror number] 27 comes back. That is unacceptable.

[APPELLANT'S COUNSEL]: Thank you judge.

(Emphasis added).

Appellant contends that the trial court erred by not making specific findings that his race-neutral explanations for striking Jurors # 26 and # 27 were pretexts for intentional discrimination, by requiring that the reasons proffered for the strikes be sufficient to justify the exercise of a challenge for cause, rather than merely being race-neutral, and by invoking the "extreme remedy" of reseating the stricken jurors. In addition, appellant argues that the special deference ordinarily

accorded trial courts' *Batson* rulings does not apply in this case because the court rejected his race-neutral explanations for the strikes. Citing *Ball v. Martin*, 108 Md.App. 435, 456–57, 672 A.2d 143, *cert. denied*, 342 Md. 472, 677 A.2d 565 (1996), in support, he reasons that "[a] trial court's rejection of a facially neutral explanation deserves less deference than a trial court's acceptance of a facially neutral explanation . . . . because the . . . improper rejection of a racially neutral explanation infringes on the striking party's peremptory challenge privilege." The State counters, *inter alia*, that appellant waived his right to raise this issue on appeal because he did not expressly oppose the trial court's decision to reseat the jurors, and, "after they were reseated, [appellant's] counsel stated: 'Panel acceptable.' "

The State is incorrect with respect to waiver. The context of the statement made by appellant's counsel ("Panel acceptable") makes plain that he was announcing his acceptance of the alternate jurors only. Indeed, after counsel made the statement he immediately clarified his position, stating, "[t]he *alternates* are acceptable." (Emphasis added). It is clear from the record, moreover, that appellant adequately apprised the trial court of his opposition to the State's *Batson* objection by articulating his reasons for the challenged peremptory strikes.

With respect to the merits of appellant's contentions, we note first that his reliance on *Ball v. Martin, supra,* is misplaced. In that case, we considered the extent to which the Supreme Court's rulings in *Purkett v. Elem, supra,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834, and *Hernandez v. New York, supra,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395, had narrowed the scope of appellate review in those cases in which trial courts had accepted the facially neutral explanations offered by the proponent of challenged peremptory strikes and had denied *Batson* challenges on that basis. *See Ball,* 108 Md.App. at 450–56, 672 A.2d 143. We explained that in such a circumstance, "an appeal on *Batson* principles has little, if any, chance of success, given that the credibility of the

proponent offering the reasons is, as it is generally, for the trial court—not the appellate court—to determine." *Id.* We further stated that

> the inevitable result of *Purkett*'s holding (and that of *Hernandez* ) is that *Batson* issues will generally be more viable on appeal in two somewhat limited instances: . . . (2) when a trial court rejects a facially neutral reason on the grounds it is pretextual, or on other grounds. But as we suggest above, *Purkett* extends great deference to a trial court's *acceptance* (as opposed to rejection) of facially neutral reasons. In doing so, *Purkett* has placed, properly we believe, the trial court, not the appellate court, in the forefront of the resolution of *Batson* issues.

*Id.* (emphasis in original).

■ Contrary to appellant's assertion, *Ball* does not support the conclusion that a trial court's rejection of a facially race-neutral explanation is entitled to less deference than its acceptance of the explanation. *Ball* merely suggests that a challenge to the court's rejection (as opposed to acceptance) of a facially race-neutral explanation may stand a better chance of success on appeal. We emphasized in *Ball* that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" because, "[a]s with the state of mind of a juror, evaluation of the [striking party's] state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Id.* at 455, 672 A.2d 143 (quoting *Hernandez,* 500 U.S. at 364, 365, 111 S.Ct. 1859 (internal quotation marks omitted)). Thus, no logical distinction may be drawn between those cases in which the trial court has accepted the race-neutral reasons offered, and those cases in which it has not. In both instances, "the decisive question [is] whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859. For this reason, the deference that we accord a trial court's finding on the issue of discriminatory intent is the same regardless of whether it accepted or rejected the reasons offered for the strikes.

Second, appellant is wrong when he asserts that the trial court erred by not making specific findings that his facially race-neutral explanations were pre-textual. The findings were implied in the court's decision to reseat the jurors and in its determination that the reasons given for removing them were "unacceptable." *See Wainwright v. Witt,* 469 U.S. 412, 430, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). It is well-settled that the trial court need not spell out every step of its reasoning process in reaching legal or factual conclusions, as "[t]rial judges are presumed to know the law and to apply it correctly." *Howard County v. One 1994 Chevrolet Corvette,* 119 Md.App. 93, 108, 704 A.2d 455 (1998). In the absence of a request by appellant for the court to articulate the basis for its conclusion that the challenged peremptory strikes were racially motivated, no further explanation was required.

Third, appellant's contention that the trial court improperly rejected his facially race-neutral explanations because they did not rise to the level of a challenge for cause also is without merit. In support, appellant points out that the trial judge reseated Juror # 27, but not Juror # 38, even though both strikes were based on the race-neutral concern that the jurors would be more preoccupied with personal matters than with the merits of the trial, and that the trial judge reseated Juror # 26, but not Juror # 30, even though both strikes also were based on similar race-neutral reasons. Appellant concludes from this that the true basis for the trial judge's rulings was not that "he disbelieved [appellant's] counsel's reasons for the strikes, but [that] he disagreed with . . . counsel over whether the . . . jurors could be fair."

We disagree with appellant's reasoning. As we already have explained, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859. Thus, the mere fact that the trial judge believed a facially race-neutral explanation for one strike but disbelieved the same explanation for another strike does not mean that the judge's

decision resulted from something other than his evaluation of the proponent's credibility.

 Moreover, the record does not support appellant's argument. First, appellant's reasons for striking Jurors # 26 and # 30 were not the same. Appellant's attorney proffered that he struck Juror # 26 because "[s]he was employed by the Criminal Assignment Office," and that he did not "want a person employed by Criminal Assignment sitting on [his] jury." By contrast, he stated that he struck Juror # 30 because "he kept looking back in our direction." As is apparent from the court's decision to reseat Juror # 26, it did not find appellant's explanation for the strike credible.

 The record also supports the trial court's finding that appellant's explanation for striking Juror # 27 was pretextual. During *voir dire* examination, before the parties exercised their peremptory challenges, the trial judge explained to the prospective jurors:

> For the people who indicated to me that they have doctors['] appointments for I think somebody has one for Monday, one for Tuesday, if you are selected, *that will not present a problem.* The only thing I would suggest to you is just let me know the day before and then we can work it out *so you wouldn't miss your doctor[s'] appointments.*

(Emphasis added). Because the trial court already had assured Juror # 27 that jury service would not interfere with his doctor's appointment, it was reasonable for it to conclude that appellant's explanation for striking that juror ("I don't want somebody who has a doctor's appointment worrying about that [rather] than my trial") was pre-textual. Moreover, the trial court's decision to reseat Juror # 27 but not Juror # 38, even though both strikes were based on similar race-neutral reasons, was not improper given that the reason offered for striking Juror # 27 was, in fact, no reason at all.

In addition, appellant's reliance on *Purkett v. Elem, supra,* is misplaced. In that case, the State struck two jurors on the ground that they were "the only two people on the jury ... with the facial hair. . . . And I don't like the way they looked,

with the way the hair is cut, both of them. And the mustaches and the beards look suspicious to me." *Purkett*, 514 U.S. at 766, 115 S.Ct. 1769. The United States Court of Appeals for the Eighth Circuit concluded that the State's explanations were pre-textual, as a matter of law. *Id.* at 767, 115 S.Ct. 1769. The court reasoned that if a party strikes "a prospective juror who is a member of the defendant's racial group, solely on the basis of factors which are facially irrelevant to the question of whether that person is qualified to serve as a juror in the particular case, the [striking party] must at least articulate some plausible race-neutral reason for believing those factors will somehow affect the person's ability to perform his or her duties as a juror." *Id.*

The Supreme Court reversed, holding that the Eighth Circuit had incorrectly "requir[ed] that the justification tendered ... be not just neutral but also at least minimally persuasive." *Id.* at 768, 115 S.Ct. 1769. The Court explained that the persuasiveness of the justification does not become relevant until the third step of the *Batson* inquiry, when "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.*

In this case, unlike in *Purkett,* the record indicates that the trial court rejected appellant's explanations for his strikes, not because they were insufficient to support a challenge for cause, but because they were merely pretexts for intentional discrimination. Indeed, the court stated:

The physician lady, I'll give you the benefit on that. The physician lady which was [juror number] 38, juror number 11, don't bring her back. [Juror number] 30. I don't have a problem. *That was a neutral reason.* [Juror number] 29 was a *neutral reason.* So as we stand, only [the explanation for striking juror number] 26 is *unacceptable.*

(Emphasis added). From the context of the court's remarks, we can infer that it deemed an "acceptable" reason to be one that was truly race-neutral. The court's determination that the reasons offered by appellant for striking Jurors # 26 and # 27 were "unacceptable" thus made plain its finding that the

strikes were racially motivated. After carefully reviewing the record, we cannot say that the trial judge was clearly erroneous in so finding.

Finally, there is no merit to appellant's assertion that the trial court's "resort to the 'extreme remedy' of recalling the str[icken] jurors was reversible error." The appropriate remedy for a *Batson* violation is a matter within the sound discretion of the trial judge. *See Jones v. State,* 343 Md. 584, 602–03, 683 A.2d 520 (1996). Moreover, "[u]nless a party can demonstrate how he or she has been prejudiced, that party cannot complain that the seating of an improperly challenged juror violates his or her right to an impartial jury." *Id.* at 604, 683 A.2d 520 (citation and internal quotation marks omitted). Appellant has made no such demonstration in this case. We find no abuse of discretion in the trial court's decision to reseat the improperly stricken jurors as a sanction for appellant's *Batson* violations.

## II

Appellant's next claim of error concerns the testimony of Angelena Richardson, one of the shooting victims. When the case went to trial in April 1998, Angelena was nine years old.

Appellant's criminal agency was hotly contested and therefore identification was a critical issue at trial. After the shooting, Angelena told the police that she did not know who had shot her. She did not identify the gunman to the authorities at any time before trial. In his opening statement, the prosecutor told the jury that Angelena would be testifying, but that she would be unable to identify appellant.

On direct examination, Angelena answered "Yes" when asked, "Do you know Mantice?" She was then asked to recount the events of the evening in question. Angelena testified that she and some other children were inside the house at 2111 Barclay Street playing hide and seek. They were crouched behind the front door of the building when shots rang out. The other children ran into the bathroom and shut the door. Angelena still was behind the front door, and

someone was pushing on it to get in. She then ran through the house, knocking on doors and trying to get into a room for safety. Eventually, the children and Ms. Rose, the occupant of the house, let Angelena into the bathroom with them. Ms. Rose put her in the bathtub. Angelena's mother and the police arrived, and Angelena was taken to the hospital.

At that point in Angelena's testimony, the following ensued:

[PROSECUTOR]: You said earlier that you knew Mantice. How did you know Mantice?

[WITNESS]: Because he used to be my sister's friend Nee.[2] They used to go together.

[PROSECUTOR]: You saw them together?

[WITNESS]: Yes.

[PROSECUTOR]: Do you see him here today? Look around.

[WITNESS]: Yes.

[PROSECUTOR]: Can you point to him?

[WITNESS]: (Indicating)

[PROSECUTOR]: Did you see who shot you?

[WITNESS]: No. I only saw the face.

[PROSECUTOR]: What face did you see?

[WITNESS]: Mantice.

[PROSECUTOR]: That was the day you were shot?

[WITNESS]: Yes.

(Emphasis added).

On cross-examination, Angelena acknowledged that she had never told anybody that the face that she had seen at the time of the incident was appellant's face; that she recalled telling the police that she did not remember who had shot her; and that her mother had not asked her who had shot her. She further testified that her mother had told her never to "say it out in public" and never to tell the police that she knew who

---

**2.** Subsequent testimony made plain that "Nee" was a friend of Angelena's older sister.

had shot her. When asked by defense counsel, "Why are you saying today that the face that you saw inside that apartment was Mantice's face?" Angelena replied, "Because I remember his face when Nee used to go with him."

On re-direct examination, the following took place:

[PROSECUTOR]: Early on, people were asking you who shot you, weren't they?

[WITNESS]: Yes.

[PROSECUTOR]: But you didn't see the person who shot you, did you?

[WITNESS]: I saw the face.

[PROSECUTOR]: You saw a face?

[WITNESS]: Yes.

[PROSECUTOR]: Now, did I tell you to say Mantice Parker?

[WITNESS]: No.

[PROSECUTOR]: Is it true that you saw his face the day you were shot?

[WITNESS]: Yes.

At the conclusion of the State's case, appellant moved for a mistrial. He argued:

[T]he[re is] strong evidence . . . that Angelena Richardson has been tampered with by some party, most likely her mother[,] into giving the testimony she gave. . . .

. . . And [the mother's] contact with her daughter . . . certainly leaves open a very strong possibility [that] she could have tainted her daughter's testimony and had [Angelena] directly or indirectly testify in a way which identified [appellant].

If you look at the overwhelming evidence in the case there is absolutely nothing that suggests [that Angelena made] a prior identification of [appellant]. The State concedes that issue. So on the day [that] she is supposed to testify she comes in and is able to identify him? It is highly irregular.

The trial court held an evidentiary hearing, out of the presence of the jury. Angelena's mother, Vernette Brown, was put on the witness stand and was examined by the parties. Ms. Brown testified that Angelena had known appellant before the shooting incident and that she had identified him to her as the shooter on the day of the incident. Ms. Brown further testified that soon after the day of the shooting, Angelena had identified appellant to the prosecutor as the shooter. According to Ms. Brown, neither she nor anyone else told Angelena what to say at trial.

The prosecutor denied ever having been told that Angelena could identify appellant as the shooter. He told the court that only after giving his opening statement did he learn that Angelena would be able to identify appellant as the shooter. Other than Ms. Brown's testimony, there was no evidence that Angelena ever had identified appellant as the shooter prior to her testimony at trial.

After hearing argument of counsel, the court denied the motion for mistrial. It explained:

... I'm not satisfied that there was, in fact, any testimony regarding tampering of this young child.... The other part of that was whether or not there was any possibility of any wrongful conduct on the part of the State and certainly there was nothing to indicate to the court there was any wrongful conduct by the State.

I think it is clear that [Angelena] did, in fact, know [appellant] from before. Whether or not she had heard others say —— quite possibly she could have, I don't know—— as [her mother] testified, everybody in the neighborhood was talking [about the rumor that appellant was the gunman], although she testified [that] she tried to shield [Angelena] from it. I find nothing to indicate to me that there was any prompting or coaching by [Angelena's mother] of the witness, consequently the motion will be denied.

Appellant contends that the trial court erred in denying his motion for mistrial because Angelena's in-court identification of him was "a problematic procedure due to its suggestive

nature" and her testimony was so unreliable as to amount to a violation of his right to due process. The State responds that this argument was not raised below, and thus is not properly before this Court, and that it is without merit in any event.

We agree that the points appellant now argues are not those that he raised in support of his motion for mistrial. His argument below focused on whether Angelena's mother had acted so as to taint her testimony, thereby making it unreliable, and whether the State had acted improperly by failing to disclose prior to trial that Angelena would testify that appellant was the shooter. Appellant does not argue that the trial court was clearly erroneous in its factual findings that Ms. Brown did not coach Angelena as to what to say on the witness stand, or otherwise act so as to make her testimony unreliable, and that the State did not know that Angelena was going to testify as she did, and therefore could not have withheld such knowledge. Instead, he maintains that the in-court identification procedure itself was suggestive, and that Angelena's testimony otherwise was unreliable because it could have been the product of rumors in the neighborhood. Accordingly, appellant did not preserve these issues for review. Rule 8–131(a).

Even if appellant had raised in the trial court the arguments he now advances, we would reject them. In *Chase v. State,* 120 Md.App. 141, 151–52, 706 A.2d 613 (1998), we explained with respect to in-court identifications:

In order to establish that an in-court identification of a defendant was a violation of the defendant's due process rights, that defendant must first demonstrate that the identification was unduly suggestive. If the defendant can demonstrate that an identification was unduly suggestive, the court reviewing his claim must then look to see whether the suggestiveness of the identification was sufficiently outweighed by factors of reliability. The most important of these factors of reliability, set forth by the Supreme Court in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), are "the opportunity of the witness to view the

criminal at the time of the crime, the witness' [sic] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* at 199–200, 93 S.Ct. at 382. If the suggestive identification is sufficiently outweighed by these factors of reliability, then the identification is deemed to be valid.

Whether an in-court identification of a defendant is unduly suggestive is a matter of dispute among courts. Some courts have held that in-court identification, because of the way the defendant is isolated at the counsel table, is inherently unfair, particularly when the witness has never identified the defendant before. *See United States v. Hill,* 967 F.2d 226, 232 (6th Cir.1992). Others, most notably this Court in *Green v. State,* 35 Md.App. 510, 520–21, 371 A.2d 1112 (1977), have rejected the notion that in-court identifications are unduly suggestive.

In *Green v. State,* 35 Md.App. 510, 371 A.2d 1112, *rev'd on other grounds,* 281 Md. 483, 380 A.2d 43 (1977), Judge Moylan stated for this Court that to the extent that a defendant contends that an in-court identification is impermissibly suggestive because of trial procedures, as opposed to pre-trial procedures, that contention must be advanced by way of cross-examination. "An in-court identification, as any other evidence, civilly or criminally, may be tested and probed by the traditional device for such testing and probing—the use of cross-examination." *Id.* at 521, 371 A.2d 1112.

Although appellant asserts in general terms in his brief that Angelena's in-court identification of him was the product of an unduly suggestive procedure, he at no point informs us what procedure he claims was "suggestive," or how it was suggestive. The sole contact that Angelena had with the police, one and one-half years before the trial, did not result in her identifying appellant as her assailant. In addition, there was no evidence of any "procedure" having been employed by the police or the prosecutors prior to Angelena's testimony. Thus, the only "procedure" about which appellant

is complaining must be the trial itself. He does not explain, however, what about the conduct of the trial was suggestive vis a vis Angelena's in-court identification of him. To the extent that we would be inclined to review the trial proceedings for lack of due process, we cannot do so in the absence of any indication of what the supposedly offensive process was. Moreover, as *Green* teaches, if there had been something about the conduct of the trial itself that rendered Angelena's in-court identification of appellant the product of suggestion, and hence arguably unreliable, appellant's proper recourse would have been to have revealed as much through effective cross-examination, thereby impeaching Angelena's testimony.

Appellant's argument that Angelena's in-court identification was unreliable because it was tainted by rumors in the neighborhood to the effect that appellant was the shooter is no less availing. "An accused is entitled to due process of law to ensure that a pre-trial identification is not 'so unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Barrow v. State,* 59 Md.App. 169, 184, 474 A.2d 967, *cert. denied,* 301 Md. 41, 481 A.2d 801 (1984)(quoting *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). An in-court identification deriving from an unconstitutional pre-trial procedure will be excluded unless, under the totality of the circumstances, it is shown that the in-court identification was of independent origin and therefore was reliable irrespective of the illegal pre-trial procedure. *Barrow,* 59 Md.App. at 184–185, 474 A.2d 967 (citing *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Simmons v. United States,* 390 U.S. 377, 384–86, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *United States v. Wade,* 388 U.S. 218, 232–37, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).

In this case, while appellant cites the cases supporting the propositions recited above in advancing his argument, he overlooks the fact that any "taint" of Angelena's testimony about which he now complains was not the fruit of arguably

illegal governmental conduct, or of any governmental conduct. Rather, it supposedly stemmed from rumors that he claims abounded in the neighborhood of the shooting to the effect that he was the shooter. The issue for the court thus was not whether there was an unconstitutional pre-trial procedure that infected the in-court identification, thereby making it a further violation of appellant's due process rights. The issue was whether the in-court identification testimony was so improper and prejudicial that a mistrial was necessary to cure the harm caused by it. *See Burks v. State,* 96 Md.App. 173, 187, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993)(A mistrial "is rather an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice.").

The trial court is in the best position to determine if the danger of prejudice arising from any alleged impropriety within the context of the entire case warrants a mistrial. *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). For that reason, its ruling is treated with great deference on appeal and will not be reversed "unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion." *Id.*

It was undisputed that Angelena knew appellant prior to the shooting because he had dated her older sister's friend. For that reason, and as her testimony made plain, Angelena could identify appellant as appellant, irrespective of his involvement *vel non* in the shooting. Angelena's revelation that the person she had just identified—appellant—was the person whose face she had seen when she was shot was not suggested by the prosecutor's questions to her, and clearly was a surprise to all present. There was no evidence whatsoever presented to the trial court to show that Angelena's mental image of appellant's face from the day of the shooting was the result of her having heard rumors in the neighborhood that he was the shooter. (Indeed, the court found as a fact that while it was "possible"

that Angelena heard rumors of that sort, Ms. Brown had tried to shield Angelena from them). Moreover, appellant had adequate opportunity to expose any weaknesses and inconsistencies in Angelena's identification testimony through cross-examination, and did so. The issues of Angelena's credibility and the weight to be assigned to her testimony were thus squarely before the jury. The trial court did not err in concluding that the surprise identification testimony given by Angelena did not warrant the granting of a mistrial.

## III

Appellant next argues that the trial court erred in admitting into evidence the out-of-court statements of two unidentified declarants under the "excited utterance" exception to the rule against hearsay.

Officer Kevin Feser of the Baltimore City Police Department testified that he was the first police officer on the scene, having arrived at 2111 Barclay Street within minutes after the shooting. As soon as he entered the building, he "saw bullet casings and . . . a lot of blood throughout the living room and kitchen." He further testified that inside the building he encountered two women, both of whom were "visibly upset." The older woman was "almost like hysterical" and was "crying, running back and forth" in a "panic." The other woman was "crying [and] emotional." The women made statements to him about the shooter. The officer testified that he remembered the substance of the women's statements but could not identify the women by name and could not recall precisely which words were spoken by which woman.

When the prosecutor asked Officer Feser to tell the jury what the women had told him, appellant's attorney objected on the basis of hearsay. The trial court overruled the objection on the ground that the statements were admissible into evidence under the "excited utterance" exception to the rule against hearsay. The officer then testified that the women told him that

they were in the apartment when a black male came through the apartment followed by another black male who was shooting at him. . . . Th[e] description [the women gave of the shooter] was a black male, 5 foot 11, 5–10, 5–11, medium build, plaits in the hair, wearing blue jeans and a white T-shirt and one of the ladies said [that] he was driving a blue Ford Taurus station wagon and I got a partial tag [number].

Appellant contends that the trial court erred in allowing these hearsay statements to come into evidence because they did not qualify as excited utterances. He argues that because Officer Feser could not identify the women who made the statements and had no knowledge of their whereabouts at the time of the shooting, the State failed to establish that the women personally observed the incident about which their statements were made and thus were under the stress of the incident when they spoke. He also maintains that the evidence unfairly was duplicative because Stephanie Seeney, who may have been one of the declarants, testified at trial that within minutes of the shooting, when she was still "in shock," she told Officer Feser that she had seen a man with a gun run into 2111 Barclay Street, fire shots, and run out of the house and into a vehicle, and that she described the color, make, model, and partial license plate number of the vehicle.

In addition, relying on *Neusbaum v. State*, 156 Md. 149, 143 A. 872 (1928), and *Weshalek v. Weshalek*, 379 Pa. 544, 109 A.2d 302 (1954), appellant argues that the fact that the women had the capacity to report a physical description of the gunman and to provide a partial license plate number demonstrated that their statements were the products of reflection, and thus were lacking the requisite indicia of reliability to be admissible as excited utterances.

In reviewing the trial court's decision to admit testimony under the excited utterance exception, we examine the totality of the circumstances. *See State v. Harrell*, 348 Md. 69, 77, 702 A.2d 723 (1997). We will not reverse unless the court abused its discretion in allowing that testimony. *See*

*Johnson v. State,* 63 Md.App. 485, 495, 492 A.2d 1343, *cert. denied,* 304 Md. 298, 498 A.2d 1185 (1985); *Moore v. State,* 26 Md.App. 556, 566, 338 A.2d 344, *cert. denied,* 276 Md. 747 (1975).

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 5–801(c); *see also Ali v. State,* 314 Md. 295, 304–05, 550 A.2d 925 (1988); *Davis v. State,* 125 Md.App. 713, 716, 726 A.2d 872 (1999). "Hearsay is considered to be generally unreliable because the opponent does not have the opportunity to cross-examine the declarant." *Stanley v. State,* 118 Md.App. 45, 53, 701 A.2d 1174 (1997), *vacated in part on other grounds,* 351 Md. 733, 720 A.2d 323 (1998). For this reason, hearsay is usually inadmissible at trial. *See* Rule 5–802.

The Maryland Rules enumerate several exceptions to this exclusionary rule, however, including one for "excited utterances," under Rule 5–803. That rule provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . .
>
> . . . .
>
> . . . [ (b) ](2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition.

Thus, a hearsay statement is admissible as an excited utterance when: 1) a startling event has occurred; 2) the statement was made when the declarant was under the stress or excitement caused by the startling event; and 3) the statement relates to the startling event. *See Harrell,* 348 Md. at 77, 702 A.2d 723. The rationale underlying this exception "is that the startling event suspends the declarant's process of reflective thought, thus reducing the likelihood of·fabrication." *Id.; see also Stanley,* 118 Md.App. at 53, 701 A.2d 1174 (explaining that "an excited utterance is made at a time when the stress of the event suspends the declarant's powers of reflection and fabrication," and "[f]or this reason, the utter-

ance is considered to be more reliable and, therefore, admissible"). "The admissibility of evidence under this exception is, therefore, judged by the spontaneity of the declarant's statement and an analysis of whether it was the result of thoughtful consideration or the product of the exciting event." *Mouzone v. State*, 294 Md. 692, 697, 452 A.2d 661 (1982), *overruled on other grounds by Nance v. State*, 331 Md. 549, 569, 629 A.2d 633 (1993).

Although Rule 5–803(b)(2) makes plain that the availability of the declarant is immaterial to the admissibility of a hearsay statement under the excited utterance exception, and therefore it is not necessary to identify the declarant for purposes of showing unavailability, the rule and the cases interpreting it are silent as to whether the proponent of the evidence must be able to identify the declarant to meet his burden of showing that the declarant was under the stress of the startling event when the statement was made.

*Booth v. State*, 306 Md. 313, 508 A.2d 976 (1986), which was decided before the adoption of the Maryland Rules of Evidence and in which the Court recognized the "present sense impression" hearsay exception, is instructive. In that case, the Court of Appeals "consider[ed] the extent to which there must be proof that the declarant is speaking from personal knowledge before the statement may be admitted" under the present sense impression exception. *Id.* at 324, 508 A.2d 976. Like the excited utterance hearsay exception, the present sense impression hearsay exception applies irrespective of whether the declarant is unavailable. The Court in *Booth* explained:

Although the declarant need not have been a participant in the perceived event, it is clear that the declarant must speak from personal knowledge, *i.e.*, the declarant's own sensory perceptions. The more difficult question involves the quantity and quality of evidence required to demonstrate the existence of the requisite personal knowledge. We conclude that in some instances the content of the statement may itself be sufficient to demonstrate that it is more likely than not the product of personal perception, and in other instanc-

es extrinsic evidence may be required to satisfy this threshold requirement of admissibility. *Identification of the declarant, while often helpful in establishing that he or she was a percipient witness, is not a condition of admissibility. When the statement itself, or other circumstantial evidence demonstrates the percipiency of a declarant, whether identified or unidentified, this condition of competency is met.*

*Id.* at 324–25, 508 A.2d 976 (footnote omitted; emphasis supplied); *see also State v. Jones,* 311 Md. 23, 31, 532 A.2d 169 (1987)(reiterating "that identification of the declarant is not an absolute prerequisite to introduction of [hearsay under the 'present sense impression' exception].").

■ As the Court in *Booth* observed, "[t]he underlying rationale of the [present sense impression and excited utterance] exceptions are similar, *i.e.,* both preserve the benefit of spontaneity in the narrow span of time before the declarant has an opportunity to reflect and fabricate." 306 Md. at 324, 508 A.2d 976. We believe on that basis that the analysis that led the Court in *Booth* to conclude that evidence of the identity of the declarant is not necessary for hearsay testimony to be admissible under the "present sense impression" exception applies with equal force to the "excited utterance" hearsay exception. If the content of the statement or circumstantial evidence sufficiently demonstrates that the declarant was under the stress or excitement of the startling event to which the statement relates, it is not necessary to prove the identity of the declarant for that purpose. The evidence, however, "must not be so scanty as to forfeit the 'guarantees of trustworthiness' which form the hallmark of all exceptions to the hearsay rule." *Miller v. Keating,* 754 F.2d 507, 511 (3d Cir.1985)(quoting Fed.R.Evid. 803 advisory committee note).

Several federal courts have reached the same conclusion with respect to the "excited utterance" hearsay exception set forth in Rule 803(2) of the Federal Rules of Evidence. Because Fed.R.Evid. Rule 803(2) is virtually identical to Rule 5–

803(b)(2), these cases are instructive.[3] *See Harris v. State,* 331 Md. 137, 156–57, 626 A.2d 946 (1993).

In *Miller v. Keating, supra,* the United States Court of Appeals for the Third Circuit concluded "that statements by unidentified declarants are [not] *ipso facto* inadmissible under Fed.R.Evid. 803(2)," provided that "they otherwise meet the criteria of 803(2)." 754 F.2d at 510. Emphasizing that "[a] party seeking to introduce such a statement carries a burden heavier than where the declarant is identified to demonstrate the statement's circumstantial trustworthiness," *id.,* the court explained that

> [i]n some cases, however, the substance of the statement itself does contain words revealing [the declarant's personal] perception. A statement such as, "I saw that blue truck run down the lady on the corner," might stand alone to show perception if the trial judge finds, from the particular circumstances, that he is satisfied by a preponderance that the declarant spoke from personal perception. . . . [In other words,] the statement offered as an excited utterance may itself be a piece of the mosaic establishing its own admissibility.

*Id.* at 511; *see also United States v. Mitchell,* 145 F.3d 572, 576–77 (3d Cir.1998)(following *Miller*); *United States v. Boyd,* 620 F.2d 129, 132 (6th Cir.), *cert. denied,* 449 U.S. 855, 101 S.Ct. 151, 66 L.Ed.2d 69 (1980)(concluding that statements made by unidentified declarants were admissible under the "excited utterance" exception).

In the case *sub judice,* it was not necessary for the State to establish the identities of the declarants to show that their statements were made when they were under the stress and excitement of the shooting. The evidence demonstrated

---

**3.** Rule 803 of the Federal Rules of Evidence provides that:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * * *

(2) **Excited utterance.** A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

that the shooting had occurred inside 2111 Barclay Street only minutes before Officer Feser arrived on the scene and that adults as well as children were present in that residence and could have witnessed the events. Officer Feser's description of the women declarants as "visibly upset," "crying, running back and forth," "almost like hysterical," "crying [and] emotional," and in a "panic" when they spoke to him minutes after the shooting was classic evidence of the circumstances necessary to make a statement an "excited utterance." Although the statements themselves did not contain expressions of excitement, the events they related are such as ordinarily would produce excitement in a first hand observer. There was no dispute that the time period between the shooting and the making of the statements was extremely brief. There was ample evidence to show the statements' circumstantial trustworthiness.

In addition, we do not find persuasive appellant's argument that the trial court erred in admitting the statements in question into evidence as "excited utterances" when Stephanie Seeney, who may have been one of the unidentified declarants, testified at trial. Appellant argues that Ms. Seeney's testimony took on added significance and weight because, assuming she was one of the unidentified declarants, her version of events came into evidence twice. The simple answer to this argument is that the excited utterance hearsay exception does not predicate admissibility on the unavailability of the declarant. Even if it were known that Ms. Seeney was one of the declarants of the excited utterances, her availability as a witness would not render the excited utterances inadmissible, nor would it render her own testimony inadmissible.

Finally, we also find no merit in appellant's contention that the declarants' ability to describe the gunman with particularity and to recite a partial license plate number belied the nature of their statements as excited utterances. A person may be under the stress or excitement of a startling event and still be able to perceive and recount the details of what he or she has just seen. The mere fact that the declarants in this

case could report the gunman's physical characteristics and recall a partial license plate number for his vehicle did not establish that their statements were not excited utterances. *See Cole v. Tansy,* 926 F.2d 955, 958 (10 th Cir.1991).

Moreover, the cases upon which appellant relies in support of his contention are inapposite. In *Neusbaum v. State,* 156 Md. 149, 143 A. 872, *supra,* the defendant was convicted of manslaughter in the "hit and run" death of a pedestrian. A witness to the event, who was in a nearby vehicle, testified that his daughter, who also had been in his vehicle, had witnessed the event. *Id.* at 163, 143 A. 872. He stated that after his daughter exclaimed, "Oh, he ran right over that man," she said, "Get his number," and then wound down the car window on his side of the car and recited a series of numbers. *Id.* The Court held that the declarant's recitation of the license plate number of the vehicle was erroneously admitted into evidence under the doctrine of *res gestae.*[4] *Id.* at 163–64, 143 A. 872. The Court explained that the statement was inadmissible because it was not triggered by the shock of seeing the startling event but instead "was the result of a voluntary investigation made by [the declarant] for the purpose of ascertaining the identity of the person owning or driving the automobile which caused the injury...." *Id.* at 164, 143 A. 872.

In the case *sub judice,* the declarants' statements established that they had just witnessed a startling "event" that

---

4. In *Booth v. State,* 306 Md. 313, 316, 508 A.2d 976, the Court explained:

The term *"res gestae"* came into usage in discussion of admissibility of declarations in the early 1800's. *McCormick on Evidence,* § 288, at 686 (2d ed. E. Cleary 1972); 6 J. Wigmore, *Evidence* § 1767, at 253–59 (Chadbourn Rev.1976). As Professor McCormick points out, the term is more generic than particular and includes within its definition four distinct exceptions: declarations of present bodily condition; declarations of present mental states and emotions; excited utterances; and declarations of present sense impressions. *McCormick on Evidence, supra,* § 288, at 686. Although the term *res gestae* is now condemned in academic circles, the exceptions included within its definition are recognized by most scholars.

(Footnote omitted).

consisted of a man running into 2111 Barclay Street in chase of another man, shooting a gun, and then leaving the scene in a vehicle. The declarants had not observed the incident from a distance or from a point of safety. Rather, they were in the midst of it. When they made their remarks to Officer Feser moments later, they had perceived and to some extent absorbed the event and were excitedly exclaiming about it. Their perception of the physical characteristics of the shooter and the vehicle was part and parcel of their experience of the startling event, the effects of which still were evident. It was not the product of an after-the-fact deliberate effort on their part to gather information.

In *Weshalek v. Weshalek, supra,* a police officer who arrived at the scene of a traffic accident approximately twenty-five minutes after it had occurred transported one of the victims to the hospital. 109 A.2d at 303. On the way there, the officer asked the victim "what [had] happened, and he tried to explain." *Id.* The court concluded that the trial judge erred in permitting the officer to testify about the victim's description of the events surrounding the accident because the statement was not part of the *res gestae.* The court reasoned:

> [The driver], injured and suffering as he was, nevertheless, had sufficient opportunity to reflect on the happening of the accident. The statement was not occasioned by any emotional or impulsive outburst, but consisted of a considered narration of his idea as to how the accident happened.

*Id.* at 304.

In this case, unlike in *Neusbaum* and *Weshalek,* the record supports the trial court's finding that the declarants were under the stress and excitement of the shooting incident when they spoke to Officer Feser, and that their statements were given as spontaneous and impulsive reactions to the situation. Consequently, the statements bore the requisite indicia of reliability to be admitted into evidence as excited utterances. The trial court did not abuse its discretion in overruling appellant's objection to them.

## IV

Appellant last contends that the trial court erred in refusing to grant his motion to suppress a photographic identification made of him by Darcell Taylor, and in admitting into evidence at trial a written and signed statement by Darcell Taylor.

Ms. Taylor was one of the witnesses the police encountered when they arrived at the crime scene. Soon after the shooting, Baltimore City Police Detectives Eric Eason and Christopher Smith interviewed Ms. Taylor at the police station. At 8:40 p.m. (2040 hours), Ms. Taylor gave a statement to Detective Smith. In it, she said that she had been sitting at the corner of Barclay and 22 nd Streets when she heard shots. She immediately took cover. When the gunfire stopped, she heard a child screaming that she had been shot. Ms. Taylor ran to the house where the shooting had taken place so she could render assistance to the child and determine whether anyone else was hurt. In response to the question, "Did you see the shooter or anyone with a gun?" Ms. Taylor wrote, "No." The last page of the statement was signed by Ms. Taylor at "2055 HRS."

Thereafter, Detective Eason showed Ms. Taylor a photographic array. Ms. Taylor selected appellant's picture from the array. She then signed her name on the "photo array card," above appellant's picture. The date and time written below Ms. Taylor's signature is "10/14/96 2349 hrs." On the reverse side of the "photo array card" Ms. Taylor wrote: "I Darcell saw the young man I just picked out comit [sic] the crime that took place on Barclay St. wich [sic] a little girl got shot." The reverse side of the "photo array card" also bears the date and time, "10/14/96 2349 hours."

Finally, sometime that night, Ms. Taylor added a "continuation" to the written statement she had given to Detective Smith. The "continuation," which is signed by Ms. Taylor and by Detective Eason, and is dated October 14, 1996, but is not timed, reads:

Q. Did you see anyone pull up in a Ford Taurus station wagon ligt [sic] blue in color?

A. Yes! I was standin [sic] on 22nd & Barclay when he stoped [sic] and sat for a few then he got out and started to chase a man into the apartment [sic] that's [sic] when I heard shoots [sic] I took cover until they finish [sic] then I saw a young man return to the car and leave! . . .

Appellant moved to suppress Ms. Taylor's photographic identification and her writing on the back of the "photo array card." The court conducted a suppression hearing on April 6 and 13, 1998. At the hearing, Ms. Taylor testified that during her interview, Detective Eason asked if she was acquainted with "Mantice Parker." She told him that she knew a man named "Mantice" but she did not know if his last name was "Parker." Ms. Taylor explained that Detective Eason then showed her the photographic array so that she could determine whether they were referring to the same person, and that she selected appellant's photograph for that reason, and not for the purpose of identifying him as the gunman. She acknowledged signing her name above appellant's picture, but claimed that she did not remember writing the statement on the back of the card. Ms. Taylor further testified that although she had seen appellant walk back to the blue Ford Taurus after the shooting, she had not seen him get out of the car and she had not seen him shoot anyone. At the conclusion of the hearing, the court denied appellant's motion to suppress.

At trial, the State called Ms. Taylor as a witness. She testified that she was about a block away from 2111 Barclay Street when shots rang out. She was familiar with appellant's vehicle and saw it parked at the corner before the shooting started. Also, before the shooting started, she saw Jamal Jones being chased down the street by someone. She could not tell who that someone was. After the shooting, she saw appellant get into his car and drive away.

Ms. Taylor acknowledged at trial, as she had at the suppression hearing, that she had chosen appellant's picture from the photographic array and that she had signed her name on the

"photo array card" above appellant's picture. She reiterated that she had signed the card solely for the purpose of identifying for Detective Eason the person known to her as "Mantice." Contrary to her testimony at the suppression hearing, however, Ms. Taylor stated that she remembered writing the words identifying appellant as the perpetrator of the crime on the back of the "photo array card." She testified that Detective Eason "just told me to put —— write down in so many words, okay? Some of the words he had used, I used also. I was just writing it down.... I didn't know that he was saying that I saw Mantice...."

With respect to the "question and answer" written and signed statement that she gave to the police, Ms. Taylor testified at trial that she had understood the questions, that she had attempted to articulate her answers clearly so that they could be understood, and that she believed that the police understood them. Ms. Taylor testified as follows about the portion of that statement in which she recalled "standin on 22nd & Barclay when he stoped [sic] and sat for a few then he got out and started to chase a man into the apartment[:]"

Q. During this answer you said he stopped and sat for a few and he got out. Who is he?

A. Mr. Parker.

Ms. Taylor also testified that, "I didn't know that [Detective Eason] was saying that I saw [appellant], because I did not see him shoot anyone. I don't know who did the shooting." Over appellant's objection, the "photo array card" containing Ms. Taylor's statement identifying appellant as the shooter and her second written statement were admitted into evidence.

The State later called Detective Eason as a witness. He testified as follows on direct examination:

[PROSECUTOR:] Can you tell us the questions and answers that you recall [asking Ms. Taylor during your interview with her]?

[DET. EASON:] "Did you see anyone pull up in a Ford station wagon, light blue in color?" Her answer was:

"Yes. He was standing on 22nd and Barclay when [he] stopped ... for a few [and] then he got out and started to chase a man into an apartment...."

\* \* \* \*

[PROSECUTOR:] In that answer, there is no mention of him and there is no name. Can you explain that?

[DET. EASON:] *This is when she told me [appellant] and she didn't put [appellant's] name here, but she was speaking of [appellant].*

[APPELLANT'S COUNSEL]: Objection, your Honor.

THE COURT: Overruled.

(Emphasis added).

██ Appellant contends that the trial court erred in denying his motion to suppress the evidence of Ms. Taylor's photographic identification of him, including her written statement on the back of the "photo array card." He argues that the evidence was irrelevant. There is no merit whatsoever to this contention.

██ In reviewing the lower court's denial of a motion to suppress evidence, we confine ourselves to the evidence adduced at the suppression hearing. *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987). From that evidence, the lower court reasonably could have concluded that Ms. Taylor's photographic identification of appellant was highly relevant to the single most central issue in the case: appellant's criminal agency. Indeed, it is hard to imagine how a witness's photographic identification of the defendant as the perpetrator of the crime charged could be irrelevant in the trial on that charge.

Appellant also contends with respect to the evidence presented at trial that Ms. Taylor's written and signed "question and answer" statement was inadmissible hearsay, and that the court improperly allowed Detective Eason to identify appellant as the unnamed man described by Ms. Taylor in that statement. We disagree.

■ Ms. Taylor's written and signed "question and answer" statement to the police was properly admitted into evidence. In *Nance v. State, supra,* 331 Md. at 569, 629 A.2d 633, the Court held that the factual portion of a witness's out-of-court statement is admissible as substantive evidence when certain requisite indicia of reliability are satisfied. *See also Stewart v. State,* 342 Md. 230, 237, 674 A.2d 944 (1996); *Makell v. State,* 104 Md.App. 334, 339, 656 A.2d 348 (1995). The criteria for substantive admissibility of such statements are now codified, with some variation, in Rule 5–802.1(a)(2). That rule provides:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> (a) A statement that is inconsistent with the declarant's testimony, if the statement was ... (2) reduced to writing and signed by the declarant; ....

Ms. Taylor's written and signed "question and answer" statement plainly was inconsistent with her trial testimony. In the statement, Ms. Taylor stated that she saw a man, whom she later identified as appellant, sit for a few minutes in a blue Taurus station wagon and then get out and start chasing another man into an apartment. At trial, she testified that she did not see appellant chase a man in the 2100 block of Barclay Street.

■ Ms. Taylor's statement on the back of the "photo array card" also met the requirements for admissibility under Rule 5–802.1(a)(2). The statement was inconsistent with her trial testimony that she selected appellant's photograph from the array only for the purpose of identifying for Detective Eason the man she knew as "Mantice." The statement was based on Ms. Taylor's first-hand knowledge, was written by Ms. Taylor, and was signed by her on the back of the "photo array card." Also, as we have indicated, Ms. Taylor was available for cross-examination. In addition, that statement was admissible under Rule 5–802.1(c) as "[a] statement that is

one of identification of a person made after perceiving the person."

Finally, with respect to appellant's last contention, the trial court did not err in permitting Detective Eason to identify appellant as the unnamed gunman referred to by Ms. Taylor in her written and signed "question and answer" statement. Ms. Taylor did so herself on direct examination.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**